695 N.E.2d 1030 (1998)
I.C.C. PROTECTIVE COATINGS, INC., Appellant-Plaintiff,
v.
A.E. STALEY MANUFACTURING COMPANY, Appellee-Defendant.
No. 79A05-9612-CV-531.
Court of Appeals of Indiana.
June 23, 1998.
*1032 Roger A. Weitgenant, North Judson, for Appellant-Plaintiff.
John M. Stuckey, Stuart & Branigin, Lafayette, for Appellee-Defendant.

*1031 OPINION
NAJAM, Judge.

STATEMENT OF THE CASE
On January 30, 1995, I.C.C. Protective Coatings, Inc. ("I.C.C.") filed a Complaint against A.E. Staley Manufacturing Co. ("Staley") for breach of contract and to foreclose on a mechanic's lien. Staley filed a counterclaim which stated eight actions against I.C.C.: breach of contract, breach of express warranty, breach of implied warranty, contractual indemnity, assignment, subrogation, negligence and slander of title. I.C.C. then moved for partial summary judgment, and Staley responded with a motion for summary judgment on all counts. After a hearing, the court granted partial summary judgment in favor of Staley. A bench trial was held on the remaining counts on August 20-21, 1996. Following the submission of proposed findings of fact and conclusions thereon, the trial court entered judgment for Staley in the amount of $171,759.07. I.C.C. now appeals.
We affirm.

ISSUES
I.C.C. presents three issues on appeal which we consolidate and restate as:
1. Whether the trial court erred when it determined that I.C.C. did not have the right to cure under the parties' contract.
2. Whether the trial court erred when it allowed testimony as to Staley's lost production and profits therefrom.

FACTS
Staley is a Delaware corporation with its principal place of business in Decatur, Illinois. The company owns and operates two manufacturing plants in Tippecanoe County, and engages in the manufacture of various types of corn starches. I.C.C. is an Indiana corporation, principally located in Porter County, which engages in the application of paints, linings and other types of protective coatings.
In the summer of 1994, Staley decided to increase its starch production capacity by adding an additional starch dryer and seven stainless steel reactors to its manufacturing plants. The reactors were approximately sixteen feet in diameter and twenty-four feet in height. Staley's starch manufacturing process employs a number of caustic substances. In order to avoid reactions between the steel in the reactors and those substances, the interior surfaces of the reactors must be lined with a protective coating.
*1033 Flakeline 103 is a coating manufactured by Ceilcote, Inc. The coating is a "heavy-duty, chemically resistant lining for protection against severe chemical exposure and immersion service." Flakeline 103 must be applied in a five-part procedure: (1) surface preparation, i.e., sandblasting to white metal; (2) priming the prepared surface; (3) application of the Flakeline 103; (4) final curing; and (5) cleanup. Ceilcote specifies that two coats of Flakeline 103 must be applied by trowel. After a ten square foot by twenty square foot area is covered with the product, styrene smoothing liquid is then applied so that the surface is smooth to the touch. Green dye is added to the first coat of Flakeline 103, but not to the second, so that the absence of green in the finished product indicates that both coats have been applied properly.
Staley engineer Roger Swift sought bids to line three of the new reactors from several protective coating contractors who represented themselves as competent in applying Flakeline 103. On June 9, 1994, I.C.C. submitted a bid stating that it would perform the contract for $93,475.00. The bid also listed the specifications for the project in accordance with the Flakeline 103 application procedure outlined by Ceilcote and provided that I.C.C. retained the right to cure any defective work. On June 17, I.C.C. sent a letter further detailing the bid.[1]
Thereafter, Staley awarded the contract to I.C.C. in a purchase order which provided in part:
Provide labor & materials to line a total of three reactor tanks w/ceilcote Flakeline 103 matl. per specification outlined in your quotation of June 9, 1994 94-F6-1499PDP. All work to be performed using time and material rates outlined in your letter of June 17, 1994. Total not to exceed $93475.00.
Staley to supply tank watch for confined space entry requirements. I.C.C. to supply monitoring and safety equipment for personnel in tank....
The purchase order further stated that goods and services were to be purchased "in accordance with the terms of this purchase order, including those terms and conditions printed on the reverse hereof." The terms on the order's reverse side provided that "any additional or different terms proposed by [I.C.C.] in any quotation, offer or otherwise are rejected unless expressly asserted in writing by Staley."
I.C.C. signed and returned Staley's purchase order without objection. I.C.C. commenced work on the contract on July 28, 1994. To perform the contract, I.C.C. had purchased 480 gallons of Flakeline 103 to cover the three tanks.[2] By August 20, 1994, I.C.C. had fully lined one reactor, had applied one coat on the second reactor and had yet to commence lining the third reactor. However, I.C.C. had already used 435 gallons of Flakeline 103 by that date. I.C.C. ceased work on the contract on August 23, 1994.
The following day, Staley objected to I.C.C.'s performance and arranged for an inspection of the reactors by Swift, I.C.C. representative Phil Dickey and Dale Hall, a former Ceilcote employee. The inspection revealed visible areas of green dye, sandblast grit and bristle hairs embedded in the lining and reactor surfaces that were rough and jagged.[3] In Hall's opinion, I.C.C.'s work was the worst that he had ever seen and was far below industry standards.
Swift then asked Hall to prepare a letter to I.C.C. describing what needed to be done to correct the defective work. Hall did so and sent the letter, via facsimile, to I.C.C. on the afternoon of August 25, 1994. Later that *1034 same afternoon, I.C.C.'s Dave Risetter wrote Swift and stated that I.C.C. would:
[M]ake all necessary arrangements and coordinate through A.E. Staley to comply and repair the Ceilcote Flakeline 103 system. All workmanship and material specifications will be in accordance to Ceilcote/Masterbuilders Specifications. Any cost which exceeds the $93,475.00 per Staley [Purchase Order] ... will be born [by] I.C.C. Protective Coatings, Inc.
Despite I.C.C.'s letter, Staley canceled its purchase order the following day.
Thereafter, Swift contacted R. Houston & Sons, Inc. ("Houston") to correct the defective work. Houston had performed work for Staley in the past and had submitted a bid for the contract awarded to I.C.C. Houston repaired the first two reactors from August 25, 1994, until September 22, 1994, at a cost of $54,285.06. Houston lined the third reactor from January 22, 1995, until February 10, 1995, at a cost of $51,345.39.
In granting partial summary judgment for Staley, the trial court found that the general terms and conditions, including the right to cure, had not been incorporated into the purchase order. Subsequent to the trial on the remaining issues, the trial court entered judgment against I.C.C. on its claims for breach of contract and to foreclose a mechanic's lien. The court further entered judgment for Staley on all of its counterclaims and awarded Staley $171,759.07 in damages.

DISCUSSION AND DECISION
The law of contract construction by courts is well settled. It is the duty of courts to interpret a contract so as to ascertain the intent of the parties. First Federal Sav. Bank of Indiana v. Key Markets, Inc., 559 N.E.2d 600, 603 (Ind.1990). In interpreting a written contract, the court will attempt to determine the intent of the parties at the time the contract was made as disclosed by the language used to express their rights and duties. Id. at 603. If the contract is ambiguous or uncertain in its terms and if the meaning of the contract is to be determined by extrinsic evidence, its construction is a matter for the fact finder. Id. at 604. If the ambiguity arises because of the language used in the contract and not because of extrinsic facts, then its construction is purely a question of law to be determined by the trial court. R.R. Donnelley & Sons v. Henry-Williams, Inc., 422 N.E.2d 353, 356 (Ind.Ct. App.1981). When a court finds a contract to be clear in its terms and the intentions of the parties apparent, the court will require the parties to perform consistently with the bargain they made. Id.

Issue One: Right to Cure
I.C.C. argues that Staley breached the parties' contract when it refused I.C.C.'s offer to cure the defective work. Specifically, I.C.C. argues that its contract bid, which provided for the right to cure, formed the basis of the parties' agreement. In the alternative, I.C.C. argues that the bid was incorporated by reference into the parties' contract by operation of Staley's purchase order. Staley counters that the purchase order served as a counteroffer to I.C.C.'s bid, that the order's integration clause limited the parties' agreement to the terms and conditions contained within the order, and that I.C.C.'s bid, although referenced by the purchase order, was incorporated into the parties' contract only for a limited purpose. We agree with Staley's contentions.

1. Purchase Order as Counteroffer

I.C.C. maintains that its bid constitutes an "offer." As such, I.C.C. argues that Staley accepted the bid through its purchase order and that the parties' relative rights and duties are to be determined by the terms and conditions set forth in the contract bid.
A contract is based upon an offer, acceptance and consideration. An offer must be extended and the offeree must accept it, the communication of acceptance being crucial. Bain v. Board of Trustees of Starke Mem'l Hosp., 550 N.E.2d 106, 110 (Ind.Ct. App.1990). It is well settled that in order for an offer and an acceptance to constitute a contract, the acceptance must meet and correspond with the offer in every respect. Gates v. Petri, 127 Ind.App. 670, 143 N.E.2d 293, 297 (1957). This rule is called the "mirror image rule." Radio Picture Show Partnership v. Exclusive Int'l Pictures, Inc., 482 *1035 N.E.2d 1159, 1166 (Ind.Ct.App.1985), trans. denied. An acceptance which varies the terms of the offer is considered a rejection and operates as a counteroffer, which may be then accepted by the original offeror. Uniroyal, Inc. v. Chambers Gasket & Mfg. Co., 177 Ind.App. 508, 380 N.E.2d 571, 575 (1978).
The submission of bids is often described as a "preliminary negotiation." See 1 ARTHUR L. CORBIN, A COMPREHENSIVE TREATISE ON THE WORKING RULES OF CONTRACT LAW 22 (1963). Indeed, a quotation of prices is not an offer, for a mere quotation of price leaves unexpressed many terms that are necessary to the making of a contract. Id. at 26. Consequently, bids are often used as a means to gather information from competitors for the best price possible. Longmire v. Indiana Dept. of State Revenue, 638 N.E.2d 894, 898 (Ind.Tax 1994). While a price quotation or bid, if detailed enough, can amount to an offer creating the power of acceptance, the submission of a purchase order by a buyer in response usually constitutes an offer. 17A AM JUR 2d, Contracts, § 46 at 76 (1991).
We need not decide whether I.C.C.'s bid was sufficiently detailed to constitute a formal offer. Even assuming that I.C.C.'s bid was an offer, Staley's purchase order constituted a counteroffer in that it varied the terms and conditions of the proposed agreement. Specifically, the bid provides that I.C.C. "shall correct" any nonconforming work and that such remedy is the only remedy available to Staley. However, under the purchase order, Staley reserved the right to reject, refuse or revoke any nonconforming goods ordered under the bid or to cancel any nonconforming performance. The order further stated that the remedies expressly provided by the purchase order were not exclusive of any other remedy allowed by law.
It is undisputed that I.C.C. accepted Staley's purchase order without objection. Whether viewed as the original offer or as a counteroffer, the purchase order was the offer which formed the basis of the parties' agreement. By signing and returning the purchase order, I.C.C. accepted the offer and, thus, entered into a binding agreement according to the terms and conditions set forth in the order. Absent a showing by I.C.C. that the parties did not intend the purchase order to be the sole memorial or integration of the contract, see discussion below, we must conclude that I.C.C. did not have the right to cure.

2. Integration

In defending this appeal, Staley asserts that the purchase order contained an integration clause which confirms that the order was intended to be the sole memorial of the parties' agreement. Staley directs us to language in the purchase order which states that the agreement was limited to the terms and conditions contained within the order and that Staley rejected "any additional or different terms proposed by [I.C.C.] in any quotation, offer or otherwise ... unless expressly asserted in writing by Staley." Pursuant to this language, Staley maintains that the trial court was prohibited from considering parol evidence, i.e., I.C.C.'s bid, to determine the terms of the parties' agreement.
Generally, where the parties to an agreement have reduced the agreement to a written document and have stated in an integration clause that the written document embodies the complete agreement between the parties, the parol evidence rule prohibits courts from considering parol or extrinsic evidence for the purpose of varying or adding to the terms of the written contract. Millner v. Mumby, 599 N.E.2d 627, 629 (Ind.Ct.App. 1992). The determination of whether the parties intended a writing to be totally integrated must be based on all the relevant evidence. Franklin v. White, 493 N.E.2d 161, 166 (Ind.1986). However, an integration clause does not control the question of whether a writing was intended to be a completely integrated agreement. Id.
The weight to be given an integration clause will vary, depending on the facts and circumstances of each particular case. Id. Where the parties are not in a position of power to bargain equally, the integration clause may not accurately express a meeting of the minds. Id. However, *1036 where two sophisticated parties engage in extensive preliminary negotiations, an integration clause may, in fact, reflect their mutual intention to abandon preliminary negotiations in favor of a complete and final statement of the terms of their agreement. Id.
We cannot say that I.C.C. and Staley "engaged in extensive preliminary negotiations." However, nothing in the record indicates that I.C.C. was "unsophisticated," or that Staley mislead or defrauded I.C.C. The language used in the purchase order integrating the parties' agreement is clear and unambiguous. By signing Staley's purchase order without objection, I.C.C. obligated itself to the terms and conditions set forth in the order. Thus, we hold that the parties' contract was fully integrated and that we cannot consider parol evidence to determine whether I.C.C. had the right to cure.

3. Incorporation by Reference

Still, I.C.C. contends that its contract bid and subsequent letter to Staley were incorporated by reference into the parties' agreement. Specifically, I.C.C. directs us to the language in the purchase order which provides:
Provide labor & materials to a line a total of three reactor tanks w/ceilcote Flakeline 103 matl. per specification outlined in your quotation of June 9, 1994 94-F6-1499PDP.
All work to be performed using time and material rates outlined in your letter of June 17, 1994. Total not to exceed $93475.00.
(emphasis added). Based on the language emphasized above, I.C.C. alleges that the purchase order incorporated I.C.C.'s right to cure, as set forth in its bid, into the parties' agreement.
Other writings, or matters contained therein, which are referred to in a written contract may be regarded as incorporated by the reference as a part of the contract and, therefore, may properly be considered in the construction of the contract. 17A AM JUR 2d, Contracts, § 399 at 426. Where a written contract refers to another instrument and makes the terms and conditions of such other instrument a part of it, the two will be construed together as the agreement of the parties. Id. However, if in a written contract, a reference is made to another writing for a particularly designated purpose, the other writing becomes a part of the contract only for the purpose specified, and is foreign to the contract for all purposes other than the one specified. Id. at 426-27.
Here, Staley's purchase order refers to certain sections of I.C.C.'s bid and letter to Staley. The order refers specifically to the Flakeline 103 application process outlined in the bid and the rates and time specifications outlined in I.C.C.'s letter to Staley. Thus, the purchase order incorporated only those sections into the parties' agreement. All other sections, including the disputed right to cure, were not incorporated into the agreement.

4. Public Policy

Finally, I.C.C. insists that "Indiana law currently favors allowing a party to cure any defects in performance." In support of that statement, I.C.C. notes that the opportunity to cure is a condition precedent for an action for breach of the implied warranty of fitness for habitation. See Wagner Const. Co. v. Noonan, 403 N.E.2d 1144, 1150 (Ind. Ct.App.1980). I.C.C. also emphasizes that the right to cure is provided under the statutes controlling the sale of goods, automobiles and health spas. See IND.CODE §§ 26-1-2-508, 24-5-13-15 and 24-5-7-10.
Contrary to I.C.C.'s contention, the "uniform trend of the decisions in Indiana clearly upholds the right of freedom of contract, guaranteed by both the Federal and State constitutions." Castillo-Cullather v. Pollack, 685 N.E.2d 478, 483 (Ind.Ct.App. 1997), trans. denied, (quoting Franklin Fire Ins. Co. v. Noll, 115 Ind.App. 289, 58 N.E.2d 947 (1945)). Indeed, our courts presume that contracts represent the freely bargained agreement of the parties and that it is in the public's best interest not to restrict unnecessarily peoples' freedom of contract. Fresh Cut, Inc. v. Fazli, 650 N.E.2d 1126, 1129 (Ind.1995). Although the right to cure has been recognized in several contract settings, the right is not guaranteed in every contract, regardless of the parties' actual agreement.

*1037 Issue Two: Evidence of Lost Production and Profits
At trial, Roger Swift testified, over objection, as to his opinion that Staley lost 2.6 million pounds of starch, at a cost of approximately $130,000, due to I.C.C.'s defective performance. I.C.C. claims that evidence of Staley's lost profits was irrelevant and speculative and that Swift was incompetent to testify. We cannot agree.
Generally, recovery for breach of contract includes damages that may reasonably be considered to have arisen naturally from the breach or to have been in the contemplation of the parties at the time they entered the contract as a probable result of the breach. Orto v. Jackson, 413 N.E.2d 273, 278 (Ind.Ct.App.1980); see Hadley v. Baxendale, 9 Ex. 341, 156 End.Rep. 620 (1854). In reviewing an award of damages, we do not require any particular degree of mathematical certainty. Farm Bureau Mut. Ins. Co. v. Dercach, 450 N.E.2d 537, 541 (Ind.Ct.App.1983). Evidence of lost profits will not be considered uncertain where there is testimony which, while not sufficient to put the amount beyond doubt, is sufficient to enable the fact-finder to make a fair and reasonable finding. Adami-Saenger Partnership I v. Wood, 568 N.E.2d 1112, 1114 (Ind.Ct.App.1991).
First, we disagree with I.C.C.'s allegation that Roger Swift was incompetent to testify about Staley's lost profits. The record establishes that Swift must familiarize himself with Staley's manufacturing process and capacity to perform his job as "principal process engineer." Specifically, Swift testified that he must estimate the revenue that will be created by a new project to determine whether the project is cost-effective. Swift also testified that he is familiar with Staley's marketing and sales procedures. Thus, we conclude that Swift was competent to testify as to Staley's lost profits.
We further conclude that the evidence presented as to lost profits was relevant. The undisputed evidence shows that I.C.C. failed to comply with the specifications set forth in the parties' agreement. As a result, Staley was forced to delay operation of the reactors until I.C.C.'s defective work was corrected. Thus, the amount of profits lost during that period is relevant to Staley's claim for damages.
Finally, Swift's testimony provided a sufficient basis for the trial court's damage award. In estimating lost profits, Swift multiplied the number of pounds of starch that would have been produced during the delay by the net profit Staley earns per pound of starch. We conclude that the damage award in this case was supported by evidence showing with a reasonable degree of certainty the amount of profits lost as a result of I.C.C.'s defective work. See Williams v. Hittle, 629 N.E.2d 944, 951 (Ind.Ct.App.1994) (court affirms damage award based upon lost profits evidenced by previous year's net profit), trans. denied.
Affirmed.
BAKER and RILEY, JJ., concur.
NOTES
[1] Specifically, the letter stated that it would take I.C.C. 1,008 hours to complete the contract. I.C.C. also provided travel, man-power and equipment rates.
[2] I.C.C.'s estimator, Phil Dickey, calculated the surface area of the three tanks to be 6,020 square feet. According to Ceilcote literature, I.C.C. could expect to cover 14.5 square feet per gallon of Flakeline 103.
[3] A subsequent inspection revealed that many of the reactors' nozzles, mounting pads and bolt holes had been plugged with Flakeline 103 contrary to express instructions and that several areas within the tanks were not coated at all, leaving the steel completely exposed. The inspection further indicated that some of the defects could not be corrected because the Flakeline 103 had been improperly mixed or applied.