

FILED

May 10 2017, 10:10 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

Robert A. Welsh
Connor H. Nolan
Harris Welsh & Lukmann
Chesterton, Indiana

ATTORNEY FOR APPELLEE

Benjamen W. Murphy
Law Office of Ben Murphy
Griffith, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Cheng Song,

*Appellant-Cross-Appellee,*

v.

Thomas Iatarola and
Theresa Iatarola,

*Appellees-Cross-Appellants*

May 10, 2017

Court of Appeals Case No.
64A03-1609-PL-2094

Appeal from the Porter Superior
Court

The Honorable William E. Alexa,
Judge

Trial Court Cause No.
64D02-1109-PL-9151

**Baker, Judge.**

[1] Cheng Song planned to purchase land from Thomas and Theresa Iatarola until he discovered that the land was zoned for agricultural use, rather than for industrial use, as had been represented to him. After terminating the purchase agreement, Song sued the Iatarolas for the $150,000 he had placed in escrow. A jury verdict awarded him the return of his money. He now appeals the trial court's denial of his petition for attorney fees and prejudgment interest. The Iatarolas cross-appeal, arguing that the trial court erred in denying their motion for summary judgment and motion to correct errors. Finding that the trial court did not err in denying the Iatarolas' motions, but that it did err in denying Song's motions, we affirm in part, reverse in part, and remand.

## Facts

[2] In 1998, the Iatarolas purchased thirty-four acres of land that was zoned for agricultural use. Thomas built several structures on the property to warehouse equipment and inventory from his telecommunications and classic car sales business.

[3] The land, which was adjacent to the Porter County Airport, was mortgaged. The Iatarolas decided to try to sell ten acres of their land to reduce or repay their debt to the bank. Thomas and Theresa agreed between themselves that Thomas would take charge of arranging for the sale of their land, and he acted as an agent on behalf of his wife from September 2010 through September 2011. On September 14, 2010, Thomas retained Robert Macmahon as their exclusive real estate agent for the sale of the ten acres.

[4] On September 14, 2010, Macmahon showed Thomas a listing agreement for the real estate sale. The form was entitled "Listing Contract (Exclusive Right to Sell) Commercial-Industrial Real Estate"; under the section entitled "Seller's Representations," the property is stated to be zoned I-2 Industrial. Appellant's App. Vol. II p. 90-91. Macmahon asked Thomas to review the listing to ensure its accuracy and asked both Thomas and Theresa to initial each page of the listing agreement to verify that they read it and that it was accurate. Thomas did so, but Theresa refused to sign her initials because the listing inaccurately stated that the zoning was I-2 Industrial rather than Agricultural. Theresa told Thomas that her reason for not initialing the listing and told him to have Macmahon correct the listing error.

[5] A few days later, Thomas told Theresa that he had spoken with Macmahon and that the listing had been corrected. Theresa did not see or initial a corrected listing. On or around September 14, 2010, Macmahon began advertising the real estate online. The advertisements stated that the land was zoned I-2 Industrial and that it was suitable for warehousing and other light industrial uses.

[6] In December 2010, Song saw online the advertisement for the sale of the ten acres of land. At this time, Song was a New Jersey resident who wanted to buy industrial real estate in northwest Indiana to use for an imported tool business he wanted to start. Song arranged a meeting with Macmahon to take place on December 31, 2010, to visit two industrially zoned properties, one of which was the Iatarolas' land. During their meeting, Song told Macmahon that he wanted

to buy property that had buildings suitable for warehousing for an imported tool business, and they discussed Song's ability to expand and build additional industrial warehousing on the property. In an internet advertisement that has Macmahon's handwriting on it, the property's type is described as "Industrial For Sale"; the property overview states that the land is "in an established industrial area." Appellant's App. Vol II p. 87.

[7] Also on December 31, 2010, Song told the Iatarolas of his intended use of the property he wanted to purchase. That same day, Song signed a purchase agreement with the Iatarolas to buy their ten acres for $600,000. The contract was entitled "Purchase Agreement Commercial-Industrial Real Estate." Appellees' App. Vol. II p. 97.

[8] Sometime before the signing, the Porter County Airport had stated that it might impose a runway protection zone in this property to comply with Federal Aviation Administration ("FAA") requirements. The purchase agreement included a contingency clause that stated, "This agreement is contingent upon the Buyer's agreement with the final approval of FAA regarding land use." *Id.* After reviewing the airport's proposal, Song worried that the runway protection zone could lead to a governmental taking of part of the property that he was purchasing, the removal of some of the warehousing buildings, or a restriction on the height of future construction. On January 6, 2011, he exercised his contingency right and terminated the purchase agreement.

[9] For the next two and one-half months, Song and Thomas negotiated a new sale of a different part of the Iatarolas' land. On March 21, 2011, they signed a second purchase agreement for sixteen acres, which included most of the original ten acres with the warehousing buildings plus additional acres of land outside the potential runway protection zone. This second purchase agreement was entitled "Purchase Agreement Commercial-Industrial Real Estate." Appellant's App. Vol. II p. 35. It required $150,000 in earnest money and included a provision for liquidated damages of $150,000 if either party breached the contract. Song and Thomas signed an addendum to the second purchase agreement that provided:

> Closing date will be predicated on the Seller's ability to vacate and exit the subject property. A maximum of 180 days ("Due Diligence Period") from the day of acceptance of this contract, has been agreed by both parties. When the seller advises the Buyer in writing, that the exit is complete, the Buyer will have 30 days, from that date, to close.

*Id.* at 40. Song deposited the $150,000 earnest money in the bank.

[10] In early June 2011, Thomas called Macmahon to say that while reviewing the transaction paperwork, he saw that the September 14, 2010, listing inaccurately stated that the property for sale was zoned I-2 Industrial instead of Agricultural. Macmahon acknowledged the error and made a note to his file of the date and subject of their phone call. That same day, Macmahon corrected the zoning represented in his advertisements online so that they showed the property to be

zoned Agricultural. Neither Macmahon nor Thomas told Song about this error.

[11] On August 7, 2011, Thomas and Song met on the property for a final inspection, and Thomas told Song that the property was zoned Agricultural. Thomas told Song that Agricultural zoning was preferred over Industrial zoning because the tax rate was lower; he also stated that Agricultural zoning allowed for the land to be used for the industrial warehousing and import tool business that Song wanted to start. Song told Thomas that he needed to consult an attorney to determine whether the Agricultural zoning would suit his needs. Later that day, Song saw that the online listing for the property had been updated to show that it was zoned Agricultural.

[12] On August 12, 2011, Lee Lane, Song's attorney, wrote to Macmahon to advise him that the Porter County zoning regulations did not permit the use of warehousing for industrial purposes on agriculturally-zoned property. Lane stated that Song would not continue with his purchase unless the Iatarolas secured I-2 Industrial zoning and demanded a price reduction in order to compensate Song for the increase in real estate tax that would result from the change from agricultural to industrial zoning.

[13] The Iatarolas refused to obtain the I-2 Industrial zoning or consider a price reduction. Song subsequently exercised his due diligence contingency rights under the contract, terminated the purchase agreement within the 180-day due diligence period provided in the addendum, and demanded the return of his

$150,000 earnest money deposit, which was being held in escrow at Horizon Bank. The Iatarolas refused to return Song's escrow deposit.

[14] On September 19, 2011, Song filed a complaint against the Iatarolas, alleging actual fraud, constructive fraud, breach of contract, and contract rescission. The Iatarolas filed a counterclaim, also alleging actual and constructive fraud. On January 22, 2014, both parties filed motions for summary judgment; the trial court denied both. A jury trial took place from May 16-19, 2016. On May 19, 2016, Song filed a motion for judgment on the evidence, which the trial court denied. The jury returned a verdict for Song, and the trial court entered judgment on the jury's verdict in Song's favor for $150,000. On June 20, 2016, the Iatarolas filed a motion to correct errors. On June 23, 2016, Song filed a motion for an award of attorney fees, prejudgment interest, and postjudgment interest. On August 12, 2016, Song filed a motion for an award of his post-trial attorney fees.

[15] On August 12, 2016, the trial court held a joint hearing for the Iatarolas' motion to correct errors and Song's motions for attorney fees, prejudgment interest, and postjudgment interest. The trial court denied all motions. Song now appeals, and the Iatarolas cross-appeal.

## Discussion and Decision

## I. Summary Judgment

[16] On cross-appeal, the Iatarolas argue that the trial court erred when it denied their motion for summary judgment. In their motion for summary judgment,

the Iatarolas argued that there were no genuine issues of material fact regarding Song's breach of the purchase agreement because nothing in the four corners of the contract allowed him to terminate it for zoning and because any representations regarding zoning could not establish the defenses or claims of fraud, constructive fraud, or mutual mistake.

[17] Our standard of review on summary judgment is well established:

> We review summary judgment de novo, applying the same standard as the trial court: "Drawing all reasonable inferences in favor of . . . the non-moving parties, summary judgment is appropriate 'if the designated evidentiary matter shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" *Williams v. Tharp*, 914 N.E.2d 756, 761 (Ind. 2009) (quoting T.R. 56(C)). "A fact is 'material' if its resolution would affect the outcome of the case, and an issue is 'genuine' if a trier of fact is required to resolve the parties' differing accounts of the truth, or if the undisputed material facts support conflicting reasonable inferences." *Id.* (internal citations omitted).

*Hughley v. State*, 15 N.E.3d 1000, 1003 (Ind. 2014).

## A. Contract Interpretation

[18] The construction of a written contract is generally a question of law. *The Winterton, LLC v. Winterton Investors, LLC*, 900 N.E.2d 754, 759 (Ind. Ct. App. 2009). When interpreting a contract, we attempt to determine the intent of the parties at the time the contract was made. *Id.* When the language of the contract is unambiguous, the parties' intent is determined from the four corners

of the document. *Id.* "The unambiguous language of a contract is conclusive upon the parties to the contract as well as upon the court." *Id.* A contract is ambiguous when a reasonable person could find its terms susceptible to more than one interpretation. *Id.* If a contract is ambiguous, the court may consider extrinsic evidence, and the construction of the contract becomes a matter for the trier of fact. *Id.*

[19] The Iatarolas argue that the second purchase agreement did not permit Song to terminate the agreement because the land was zoned differently than what he expected. Song replies that the Iatarolas waived this argument because they failed to raise it before the trial court on summary judgment. We agree that the Iatarolas failed to present a cogent argument on this issue to the trial court and therefore also agree that they have waived it.

[20] Waiver notwithstanding, at issue is paragraph nine of the addendum to the second purchase agreement, which reads

> Closing date will be predicated on the Seller's ability to vacate and exit the subject property. A maximum of 180 days ("Due Diligence Period") from the day of acceptance of this contract, has been agreed by both parties. When the seller advises the Buyer in writing, that the exit is complete, the Buyer will have 30 days, from that date, to close.

Appellant's App. Vol. II p. 40. The Iatarolas read this paragraph to mean that they had to use due diligence to vacate the premises within 180 days; Song contends that a due diligence period exists for the benefit of the buyer to investigate facts regarding the suitability of the property for the buyer's purpose.

Generally, in real estate transactions, the term "due diligence" refers to the parties' obligations to "investigate facts rather than make assumptions about them." *Hartig v. Stratman*, 760 N.E.2d 668, 671 (Ind. Ct. App. 2002). In *Metro Holdings One, LLC v. Flynn Creek Partner, LLC*, 25 N.E.3d 141, 158-59 (Ind. Ct. App. 2014), this Court considered the role of the due diligence period in a real estate transaction. The purchase agreement provided:

> "4. **Conditions of Performance.** All of the items in this Section 4 shall be completed and/or satisfied on or before [April 15,] 2007 (the "Due Diligence Period"), and Purchaser's obligations under this Agreement shall be contingent upon the timely and complete satisfaction of the following conditions precedent or waiver thereof by Purchaser, in writing:

> \* \* \* \* \*

> "(e) Wetlands Delineation Study. Purchaser, at its cost and expense, may conduct or have conducted any wetland delineation study of the Real Estate, to determine whether there are any wetlands on the Real Estate under the jurisdiction of the Army Corps of Engineers. In the event that wetlands are discovered on the Real Estate, at Purchaser's election, this agreement shall terminate and Purchaser shall receive an immediate refund of the earnest money, together with any interest earned thereon, or Purchaser may proceed with the purchase and receive a reduction of the per acre price to the extent of any delineated wetlands located on the [Phase 2 Property]."

*Id.* This Court found that the plain language of this section of the purchase agreement required the buyer to complete the study and provide written notice

of termination prior to the end of the due diligence period. Because the buyer failed to do so, this Court found that the buyer breached its contract.

[22] Unlike the purchase agreement in *Metro Holdings*, which specified actions that the buyer could take during the due diligence period and the effect of those actions, here, the purchase agreement does not state the purpose of the due diligence period. The provision supports both parties' arguments, and because of the context in which the term "Due Diligence Period" is found, a reasonable person could find its terms susceptible to more than one interpretation, making it ambiguous. Its placement in a paragraph about the Iatarolas' ability to vacate the property and the timing of the closing date implies that the due diligence period is related to their ability to actually vacate the property. And yet, as Song contends, such an interpretation is at odds with the law and how the term is generally applied in real estate transactions. When there is ambiguity in a contract, it is construed against its drafter. *MPACT Const. Grp., LLC v. Superior Concrete Constructors, Inc.*, 802 N.E.2d 901, 910 (Ind. 2004). Therefore, the phrase should be construed against the Iatarolas. Accordingly, we find that the trial court did not err when it denied the Iatarolas' motion for summary judgment based on this issue.

## B. Representations Regarding Zoning

## a. Actual Fraud

[23] In his complaint, Song alleged that the Iatarolas committed actual fraud against him based on the misrepresentation of the zoning of the property. In their

motion for summary judgment, the Iatarolas contended that they made no representations to Song about the zoning of the property; on cross-appeal, they argue that the addendum's integration clause should foreclose Song's fraud claim and that a fraud action regarding zoning representations must fail when the zoning laws are public record.

[24] The elements of actual fraud are: (i) material misrepresentation of past or existing facts by the party to be charged, (ii) which was false, (iii) which was made with knowledge or reckless ignorance of the falseness, (iv) which was relied upon by the complaining party, and (v) proximately caused the complaining party injury. *Rice v. Strunk*, 670 N.E.2d 1280, 1289 (Ind. 1996).

[25] In their motion for summary judgment, the Iatarolas contend that they made no representations of any kind to Song about the zoning of the property, but "[a]t the one and only occasion Song inquired about the zoning—long after the contract was signed and after Iatarola had vacated the property, Iatarola spoke truthfully of the zoning status." Appellees' App. Vol. VI p. 78-79. In *Craig v. ERA Mark Five Realtors*, 509 N.E.2d 1144, 1147 (Ind. Ct. App. 1987), this Court found that the defendants did not commit actual fraud because the "mere fact that the defendants represented the property as an apartment building does not rise to the level of an affirmative representation that the use of the property [as a multiple-family dwelling] was permissible under the applicable zoning ordinance." We find *Craig* distinguishable from the present case. In *Craig*, this Court noted that the term "multi-family" used in listing documents had nothing to do with zoning, but was merely used by realtors to distinguish such property

from other kinds of residential property. *Id.* Here, however, the listing document specifically stated that the property was zoned I-2 Industrial. Moreover, in *Craig*, there was no representation to the buyer about the specific zoning classification. Here, a reasonable factfinder could find that the fact that Song viewed information that described the property as "Industrial" and stated that the property is "in an established industrial area," Appellant's App. Vol. II p. 87, constitutes a false material misrepresentation. The trial court did not err in finding a genuine issue of material fact or in denying the Iatarolas' motion for summary judgment on this issue.

[26] Regarding the Iatarolas' arguments on cross-appeal, we note again that they have waived these arguments because they did not make them to the trial court in their motion for summary judgment. Waiver notwithstanding, we will address their arguments.

[27] The Iatarolas argue that the inclusion of an integration clause precludes Song's actual fraud claim. An integration clause serves "to determine the intention of the parties and to determine if that which they intended to contract is fully expressed in the four corners of the writing." *Prall v. Ind. Nat'l Bank*, 627 N.E.2d 1374, 1377–78 (Ind. Ct. App. 1994) (citing *Franklin v. White*, 493 N.E.2d 161, 166 (Ind. 1986)). "Generally, where parties have reduced an agreement to writing and have stated in an integration clause that the written document embodies the complete agreement between the parties, the parol evidence rule prohibits courts from considering extrinsic evidence for the purpose of varying or adding to the terms of the written contract." *Id.* (citing

*I.C.C. Protective Coatings, Inc. v. A.E. Staley Mfg. Co.*, 695 N.E.2d 1030, 1035 (Ind. Ct. App. 1998)). An exception applies "in the case of fraud in the inducement, where a party was 'induced' through fraudulent representations to enter a contract." *Circle Ctr. Dev. Co. v. Y/G Ind., L.P.*, 762 N.E.2d 176, 179 (Ind. Ct. App. 2002).

[28] The Iatarolas state that Song is a sophisticated and well-educated person who had "plenty of time to investigate the zoning and taxes from public record." Appellee's Br. p. 27. Song's level of education, however, does not negate the fact that "a party [can] overcome the effect of an integration clause if it [can] show it had a right to rely on the alleged misrepresentations and did in fact rely on them in executing . . . [an] integration clause." *Tru-Cal, Inc. v. Conrad Kacsik Instrument Systems, Inc.*, 905 N.E.2d 40, 45 (Ind. Ct. App. 2009). We do not find that the mere inclusion of an integration clause defeats Song's fraud claim because he had a right to rely on the Iatarolas' representations regarding the zoning of the property and did, in fact, rely on them. Therefore, we find that the trial court did not err in finding that genuine issues of material fact exist or in denying the Iatarolas' motion for summary judgment.

[29] The Iatarolas also contend that a fraud action regarding zoning representation must fail because how real estate is zoned is public record, and therefore any representation does not constitute a past or existing fact that a party can claim to have relied on. Initially, we note that the Iatarolas cite legal authority from other jurisdictions, which is not binding in our state. In Indiana, it is well established that "[a] false statement made for a fraudulent purpose . . . can be

justifiably relied upon even though the fact misrepresented is of public record."
*Shuee v. Gedert*, 182 Ind. App. 432, 438, 395 N.E.2d 804, 808 n.3 (1979); *see also*
*Carrell v. Ellingwood*, 423 N.E.2d 630, 635 (Ind. Ct. App. 1981) ("It is further the
law in Indiana that a false and fraudulent representation may be relied upon by
a person having no actual knowledge, even though the fact in question is a
matter of public record"); *Jenkins v. Nebo Props., Inc.*, 439 N.E.2d 686, 694 (Ind.
Ct. App. 1982) ("A party can justifiably rely on statements which are a matter
of public record"). Consequently, the trial court did not err in denying the
Iatarolas' motion for summary judgment on this issue.

## b. Constructive Fraud

[30] In his complaint, Song alleged that the Iatarolas also committed constructive
fraud against him based on the misrepresentation of the zoning of the property.
In their motion for summary judgment, the Iatarolas contended that Song's
constructive fraud claim must fail because any representation about the zoning
of the property did not constitute a past fact upon which Song could rely
because zoning is public information; on cross-appeal, they argue for the first
time that his claim must fail because no fiduciary relationship existed between
the parties.

[31] Constructive fraud arises by operation of law from a course of conduct, which,
if sanctioned by law, would secure an unconscionable advantage, irrespective of
the actual intent to defraud. *Strong v. Jackson*, 777 N.E.2d 1141, 1146 (Ind. Ct.
App. 2002), *on reh'g*, 781 N.E.2d 770 (Ind. Ct. App. 2003). The elements of

constructive fraud are: (i) a duty owing by the party to be charged to the complaining party due to their relationship; (ii) violation of that duty by the making of deceptive material misrepresentations of past or existing facts or remaining silent when a duty to speak exists; (iii) reliance thereon by the complaining party; (iv) injury to the complaining party as a proximate result thereof; and (v) the gaining of an advantage by the party to be charged at the expense of the complaining party. *Rice*, 670 N.E.2d at 1284.

[32] First, the Iatarolas allege that Song's constructive fraud claim must fail because zoning information is a matter of public record, but as discussed above, Indiana law permits a fraud claim even when the misrepresented fact is of public record. The Iatarolas again rely on *Craig*, but again, we find that case distinguishable. In *Craig*, this Court found that a constructive fraud claim must fail because the information at issue was in the public record and the buyer had easy access to it. 509 N.E.2d at 1148. The buyer had prior experience purchasing real estate; he managed his properties full-time; he was licensed to sell real estate for at least several years before the transaction at the heart of the lawsuit took place; and he had at one time owned and operated a real estate school. *Id.* For these reasons, this Court found that the buyer was not an "inexperienced amateur" in the real estate business, but rather that he possessed the knowledge and skill to ascertain the zoning of the purchased property. *Id.* Although Song is well-educated, his degrees are not related to real estate; he was not an Indiana resident, and the record does not show whether he was familiar with Indiana public records; the record does not indicate that he is not an "inexperienced

amateur" in the real estate business like the buyer in *Craig*; and the record does not reveal whether Song had previous experience buying any kind of real estate, let alone the kind of land that he was seeking for his new business. That information is a matter of public record is not, in and of itself, sufficient to preclude a constructive fraud claim.

[33]     Second, once again, we note that the Iatarolas present an argument on cross-appeal that was not made in their motion for summary judgment to the trial court—namely, that Song's constructive fraud claim must fail because no fiduciary relationship existed between the parties. Further, on cross-appeal, the Iatarolas do not present a cogent argument regarding the existence or lack thereof of a fiduciary relationship. Nonetheless, we will briefly address this argument. A constructive fraud claim need not involve a fiduciary relationship; the duty required for the claim may exist "where there is a buyer and a seller, where one party may possess knowledge not possessed by the other and may thereby enjoy a position of superiority over the other." *Strong*, 777 N.E.2d at 1147. The Iatarolas contend that they were not acting from a position of superiority because Song has multiple advanced degrees. They fail to recognize that under a constructive fraud claim, a position of superiority does not depend on a party's education level but on the level of knowledge that a party may possess. We find that the Iatarolas did not present evidence that would negate an element of Song's constructive fraud claim and that the trial court did not err in denying their motion for summary judgment on this issue.

## C. Contract Rescission

In his complaint, Song asked for a judgment of contractual rescission, alleging that no contract was formed because there was mutual mistake on the zoning classification. The Iatarolas did not address this claim in their motion for summary judgment, making this issue waived, though they raise it in their cross-appeal. We note that the trial court did not grant Song's request to rescind the contract. Consequently, the Iatarolas can make no claim of error on this issue.

## D. Contract Breach

In his complaint, Song alleged that the Iatarolas breached the purchase agreement, for, among other things, failing to provide an I-2 Industrial zoned property for purchase as represented and promised. In their motion for summary judgment and on cross-appeal, the Iatarolas contend that Song breached the contract when he refused to close on the transaction. The Iatarolas do not present a cogent argument or legal authority to support the position that Song caused the breach. Consequently, the trial court did not err in finding that a genuine issue of material fact existed as to which party breached the contract, and it appropriately allowed the jury to act as factfinder

on this issue. Therefore, the trial court did not err in denying the Iatarolas'
motion for summary judgment on this issue.[1]

## II. Attorney Fees

[36] On appeal, Song argues that, pursuant to the purchase agreement, he should
receive an award for his attorney fees. The Iatarolas argue that because Song
repudiated the purchase agreement, he cannot seek to have the agreement's
attorney fees provision enforced.

[37] Indiana adheres to the American rule that, in general, a party must pay his own
attorney fees absent an agreement between the parties, a statute, or other rule to
the contrary. *R.L. Turner Corp. v. Town of Brownsburg*, 963 N.E.2d 453, 458 (Ind.
2012). When an agreement allows one party to request attorney fees from
another party, it is standard procedure for that party to petition the trial court
for those fees after the jury has reached its decision in its case. *Storch v. Provision
Living, LLC*, 47 N.E.3d 1270, 1275 (Ind. Ct. App. 2015) (citing *R.L. Turner
Corp.*, 963 N.E.2d at 459-60). A petition for attorney fees presents an issue
separate from the merits of a case because the inquiry cannot commence until a
party has prevailed. *Id.* A request for attorney fees is not ripe for consideration
until a judgment has been reached. *Id.* Outside of stipulations or contracts that

---

[1] In their cross-appeal, the Iatarolas also argue that the trial court erred when it denied their motion to correct
errors after trial. Their arguments are the same as their arguments regarding their motion for summary
judgment. We apply the same reasoning and findings to their argument regarding their motion to correct
errors as we did for their motion for summary judgment.

call for a jury's decision on attorney fees, "parties do not have the right to have a jury determine a reasonable amount of fees." *Id.* The trial judge is considered to be an expert on the question of attorney fees and may judicially know what constitutes a reasonable fee. *Id.*

[38] The purchase agreement provided the following provision:

> Any party who is the prevailing party against any other party in any legal or equitable proceeding relating to this Agreement shall be entitled to recover court costs and reasonable attorney fees from the non-prevailing party.

Appellant's App. Vol. II p. 97. Following the jury's verdict in his favor, Song filed a motion for attorney fees, prejudgment interest, and postjudgment interest. His motion included an affidavit from his attorney and an itemization of fees incurred. In a post-trial hearing regarding Song's motion for attorney fees and interest, the trial court stated:

> With regard to the amount for the attorney's fees, I'm reading the exact verdict from the jury. Said the jury returned into open court with the following verdict: Verdict for plaintiff. "We, the jury, decide in favor of the plaintiff and against the defendants that the plaintiff is entitled to and shall have the return of his earnest money in the amount of $150,000." After they returned with that, I entered judgment on the verdict. At that point, the plaintiff was entitled to those funds.
>
> There was no request before the jury that I can recall with regard to attorney's fees and interest either post or pre for the trier of fact to deal with. They didn't have that. And I certainly am not going to be the trier of fact at this point in this proceedings. I

> think that the most that can be said, that the plaintiff is entitled to judgment interest from and after . . . the 19th of May of this year.

Bench Hearing Tr. Vol. III p. 37-38.

[39] Song was not required to submit to the jury a request for attorney fees. In this case, because the jury had already fulfilled its role, the trial court was the appropriate trier of fact in determining whether attorney fees should have been awarded. Further, Song was not required to submit a petition for attorney fees before the jury returned its verdict; indeed, doing so would have been premature. The appropriate time for Song to petition the trial court for attorney fees was after the jury returned a verdict in his favor—which is what Song did. The trial court erred when, instead of ruling on the issue, it simply declined to consider it. Accordingly, the judgment of the trial court is reversed and remanded so that the trial court may consider the issue of attorney fees as provided for in the parties' purchase agreement.

## III. Prejudgment Interest

[40] On appeal, Song also argues that he should receive prejudgment interest. The Iatarolas contend that Song should not receive prejudgment interest because the jury verdict did not constitute a money judgment and because the $150,000 Song placed in escrow already earned interest while in the escrow account.

[41] Indiana Code section 24-4.6-1-101 provides for "interest on judgments for money whenever rendered." A judgment for money is "any order *that requires the payment of a sum of money and states the specific amount due*, whether labeled as

a mandate or a civil money judgment." *Hilliard v. Jacobs*, 916 N.E.2d 689, 694 (Ind. Ct. App. 2009) (emphasis original). Prejudgment interest is awarded to fully compensate an injured party for the lost use of money. *Fackler v. Powell*, 923 N.E.2d 973, 977 (Ind. Ct. App. 2010). It is computed from the time the principal amount was demanded or due and is allowable at the permissible statutory rate when no contractual provision specifies the interest rate. *Id.*; *see also* Ind. Code § 24-4.6-1-103(b). The current interest rate is 8% when there is no contract by the parties specifying a different interest rate. Ind. Code § 24-4.6-1-101.

[42] It is well-settled that an award of prejudgment interest in a breach of contract action is warranted if the amount of the claim rests upon a simple calculation and the terms of the contract make such a claim ascertainable. *Fackler*, 923 N.E.2d at 979. The test for determining whether an award of prejudgment interest is appropriate is whether the damages are complete and may be ascertained as of a particular time. *Id.* The award is considered proper when the trier of fact does not have to exercise its judgment to assess the amount of damages. *Id.* Importantly for purposes of our review, an award of prejudgment interest is generally not considered a matter of discretion. *Id.*

[43] When Song's attorney asked the trial court whether it ruled on its motion for prejudgment interest and postjudgment interest, the trial court stated:

> I said it wasn't presented to the jury, they had nothing in front of them to do. You told me the fact finder was the one to do it, so there is none for prejudgment interest. Post judgment interest,

the judgment was entered on May 19th for the return of the money. It wasn't a money judgment. It was an order to turn over in effect. It's there. It's available. Go get it.

***

You have 30 days to decide when you're going to appeal it, this rather, or that. And at that point interest will be accruing on that at least from that May 19th date. At least. There you go.

Bench Hearing Tr. Vol. III p. 39-40.

[44] The Iatarolas latch onto the trial court's statement that the jury's verdict awarding Song the return of his $150,000 was not a money judgment that can receive prejudgment interest under the statute. They contend that the judgment was not a general money judgment but "rather the return of a specific item of property." Appellee's Br. p. 42. We disagree. Following the jury's verdict, the trial court ordered the Iatarolas to pay a sum of money to Song and stated the specific amount due—this order is the very definition of a money judgment. *See Hilliard*, 916 N.E.2d at 694. Because Song was awarded a money judgment, and because the amount could be ascertained as of a particular time, prejudgment interest was warranted.

[45] Although Song could have presented his claim for prejudgment interest to the jury, not doing so did not preclude his claim. In *Board of Works of City of Lake Station v. I.A.E., Inc.*, 956 N.E.2d 86, 96 (Ind. Ct. App. 2011), this Court found that the trial court did not err when it allowed the jury to determine the amount of prejudgment interest owed because the jury only had to make a simple

mathematical computation of the statutory rate from the time of the demand for damages. But in other cases, this Court has taken no issue with the fact that a trial court, rather than a jury, has determined a prejudgment interest award. *See, e.g., WESCO Distrib., Inc. v. ArcelorMittal Ind. Harbor LLC*, 23 N.E.3d 682, 714-15 (Ind. Ct. App. 2014) (discussing the trial court's award of prejudgment interest following a jury trial). Here, the trial court was not required to defer to the jury on Song's motion for prejudgment interest, and it erred by doing so.

[46] The Iatarolas contend that because the parties entered into an escrow agreement, which provided the terms for the holding and release of earnest money deposited into an interest-bearing account, Song is not entitled to any prejudgment interest on the $150,000 above and beyond the interest received on the escrowed money. The Iatarolas do not provide any legal authority to support their contention that because funds are earning interest in an interest-bearing account that a prevailing party should not also receive prejudgment interest, nor do we find any legal authority to support this argument.

[47] Nor do we find compelling the Iatarolas' suggestion that the escrow agreement should control the prejudgment interest rate. The Iatarolas state that because the "interest rate was previously defined, the Indiana prejudgment interest statute does not supersede that agreement." Appellee's Br. p. 43. The Iatarolas do not state what this interest rate is, nor do we find it defined in the escrow agreement. But even if the escrow agreement did specify an interest rate for the funds while they were held in escrow, we cannot say that that interest rate would also apply to the rate for prejudgment interest. This Court considered a

similar contention in *Bank One, Nat. Ass'n v. Surber*, 899 N.E.2d 693 (Ind. Ct. App. 2009). Following a successful breach of contract claim against it, the bank argued that the trial court erred when it awarded prejudgment interest at the statutory rate of 8%, rather than at the interest rate specified for the savings account at issue, which was 1.5%. *Id.* at 705-06. This Court found that the contract governing the savings account did not detail the interest rate that should be applied to prejudgment interest, that the parties had not agreed upon an interest rate, and that, therefore, the interest should be calculated at the statutory rate of 8%. *Id.* at 706. Similarly, here, neither the purchase agreement nor the escrow agreement states an interest rate for prejudgment interest. The Iatarolas' argument is unavailing.

[48] Accordingly, we reverse and remand the trial court's denial of Song's request for prejudgment interest, and remand so that the trial court may calculate, using the statutory rate, the amount of prejudgment interest Song is owed. On remand, the trial court should also calculate the postjudgment interest at the statutory rate.

[49] The judgment of the trial court is affirmed in part, reversed in part, and remanded with instructions to consider Song's motions for attorney fees and prejudgment interest.

Barnes, J., and Crone, J., concur.