# FOR PUBLICATION

ATTORNEY FOR APPELLANT:

**LINDSEY A. GROSSNICKLE**
Bloom Gates & Whiteleather, LLP
Columbia City, Indiana

ATTORNEYS FOR APPELLEE:

**JEREMY J. GROGG**
**MICHAEL A. BARRANDA**
Burt, Blee, Dixon, Sutton & Bloom
Fort Wayne, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

FILED
Apr 30 2012, 9:26 am

CLERK
of the supreme court,
court of appeals and
tax court

| | | |
|---|---|---|
| DANIEL P. MILLIKAN, | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No.  92A03-1109-PL-433 |
| | ) | |
| LORI A. EIFRID, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE WHITLEY CIRCUIT COURT
The Honorable James R. Heuer, Judge
Cause No. 92C01-0904-PL-236

**April 30, 2012**

**OPINION–FOR PUBLICATION**

**BAKER, Judge**

In this case, the trial court properly determined that the plaintiff was the bona fide and innocent purchaser for value of a parcel of property when applying the doctrine of equitable subrogation. Thus, title to the property awarded to the plaintiff is superior to any right, title, or interest that might be claimed by the defendant or his successors in interest. However, because the trial court determined that the defendant had not committed fraud that might otherwise have entitled the plaintiff to recover her attorney fees, we reverse that portion of the judgment and vacate the award of attorney fees.

Appellant-defendant Daniel P. Millikan appeals the judgment entered in favor of appellee-plaintiff Lori A. Eifrid, on her claims against Millikan for foreclosure, specific performance, and promissory estoppel, regarding a certain parcel of real property. Specifically, Millikan maintains that the trial court erred in applying the doctrine of equitable subrogation in these circumstances and awarding the property to Eifrid. Millikan also claims that the trial court erred in ordering him to pay Eifrid's attorney fees.

We conclude that the trial court properly awarded the real property to Eifrid. However, we also find that the trial court erred in ordering Millikan to pay Eifrid's attorney fees. Thus, we affirm in part, reverse in part, and remand this cause with instructions that the trial court vacate the award of attorney fees.

FACTS

Eifrid owns approximately .495 acres (Parcel A) of real property in Whitley County, and a four foot wide strip (Strip) of land directly to the east of that property.

2

Millikan owns certain property adjacent to Eifrid's Parcel A property, including parcels that abut a right-of-way immediately to the south of Parcel A. Both Eifrid and Millikan's property are located near the same cul de sac. The dispute in this case involves a parcel of land directly to the south of Parcel A (hereinafter referred to as the Triangle). The Triangle is essential to Eifrid's use and enjoyment of her property because, without it, Eifrid's ingress and egress to the cul-de-sac is effectively prevented.

On October 15, 2001, Richard Millikan and his wife, Charlene, executed a warranty deed transferring and conveying title to the Eifrid property and the Triangle to Roger L. Maxey. That deed was recorded in the Whitley County Recorder's Office on October 16, 2001, as document number 200110560. At the time of that transfer, the Eifrid property and the Triangle were identified as single parcels of property.

That same day, Maxey executed a mortgage on the properties he acquired from the Millikans in favor of RWG Mortgage Company, Inc. (RWG). That mortgage was recorded on October 16, 2001, as document number 200110561. However, on October 15, the mortgage in favor of RWG was assigned and transferred from RWG to ABN AMRO Mortgage Group, Inc. The assignment was recorded in the Whitley Recorder's Office on October 16, 2001, as document number 200110562.

At about the same time of the transfer, Richard's brother, Daniel Millikan (the appellant in this case), reached an oral agreement with Maxey to obtain the Triangle from Maxey in exchange for the Strip. To effectuate that exchange, Millikan caused a legal description to be determined such that the Strip would, for the first time, be described as a

3

single piece of real estate. Maxey also caused a legal description to be determined such that the Triangle would also be described as a single piece of real estate. However, the surveys for the Strip and Triangle were not completed until February 26, 2002, at which point, the ABN AMRO mortgage encumbered both Parcel A and the Triangle.

In June 2003, Maxey endeavored to refinance Parcel A and the Triangle through Mortgage Electronic Registrations Systems, Inc. (MERS), as nominee for Countrywide. The day before the closing, Maxey executed a quitclaim deed to the Triangle in favor of Millikan on June 16, 2003. Millikan reciprocated by executing a quitclaim deed to the Strip in Maxey's favor. When the Triangle was quitclaimed to Millikan, the property was encumbered by the ABN AMRO mortgage.

The transfers by and between Millikan and Maxey were undertaken without the knowledge of, or any disclosure whatsoever to, the then lienholder, ABN AMRO, or to the soon to be subsequent lienholder, Countrywide. The partitioning of the Triangle from Parcel A effectively precludes Parcel A from any access to the right-of-way in the cul de sac described above.

Millikan knew of the mortgage on the Eifrid property when he accepted the transfer from Maxey, and he never communicated that purported transfer to Countrywide. It was only through the refinancing, and payment by Countrywide to ABN AMRO, that the ABN AMRO mortgage encumbering both the Eifrid Property and the Triangle was ultimately released when Countrywide paid Maxey's outstanding indebtedness to ABN AMRO. Countrywide's expectation was a security interest in the entire property, as

4

evidenced by the legal description of the deed. The ABN AMRO mortgage was released on October 16, 2003, and Maxey later defaulted on the terms of his mortgage with Countrywide.

In consideration for the forgiveness of his financial obligation owed to Countrywide, which was in default, Maxey executed a warranty deed in lieu of foreclosure (Deed in Lieu) in favor of the Secretary of Veterans' Affairs (SVA). The Deed in Lieu from Maxey to the SVA also described and purported to transfer the Triangle to the SVA. At all times, the documents regarding any transfer or mortgage of property included Parcel A and the Triangle as a single tract.

Eifrid was to become the next owner of the property. When purchasing the property from the SVA, Eifrid was provided a deed that included the description of Parcel A and the Triangle as a single tract. On July 12, 2006, the SVA, via quitclaim deed, transferred title of both parcels to Eifrid. Eifrid was provided with a deed that included descriptions of Parcel A and the Triangle as a single tract. Thus, Eifrid believed that she was purchasing property that included access to the cul de sac as a right-of-way through the rear of the property.

Eifrid initially became aware of the issues that were caused by the attempted "swap" of properties between Millikan and Maxey in 2008, when she received notice that a mortgage company, Resurgent Capital Services, LP (Resurgent), was seeking to foreclose on the Strip. At the time, the Strip remained titled in Maxey's name. Discussions commenced between counsel for the respective parties with regard to

5

reversing the Millikan/Maxey "swap" that would result in the Triangle being owned by Eifrid and the Strip being owned by Millikan.

In addition to the fact that the Strip remained in Maxey's name, the Strip was also encumbered by a mortgage in the principal amount of $26,000. Thus, in order to effectuate the swap—or more appropriately a "swap back"—Eifrid was required to take affirmative steps to acquire clear title to the Strip. On several occasions, Eifrid informed Millikan of her intent to acquire the Strip to effectuate the swap.

On July 9, 2008, Eifrid's counsel filed a complaint to foreclose the mortgage. The trial court entered a judgment against the real estate in the amount of $38,763.23, plus interest, and ordered the Strip sold by the Whitley County Sheriff. The Sheriff's sale took place and Eifrid's counsel offered the highest bid for the Strip which was $39,440.61. Although Eifrid was in a position to conduct the swap of the Strip, Millikan's counsel advised Eifrid in correspondence dated September 16, 2008, that Millikan no longer desired to "reverse the swap." Appellant's App. p. 12, 21.

On November 20, 2008, the Sheriff issued a Sheriff's Deed on Decree. On December 4, 2008, the Strip was quitclaimed to Eifrid via a limited liability partnership deed. As a result, Eifrid owned the Strip "free and clear" of all liens and encumbrances. Id. at 13.

On April 10, 2009, Eifrid filed her complaint against Millikan for foreclosure, specific performance, and promissory estoppel. Eifrid alleged, among other things, that

41. Upon discharging the indebtedness owed by Mr. Maxey to ABN AMRO, and which was secured by real property, including the Triangle, MERS became equitably subrogated to ABN AMRO's rights, title and interest in and to the ABN AMRO mortgage executed October 15, 2001.

42. Accordingly, MERS was entitled to stand in the shoes of ABN AMRO and retain priority over any and all interests in or to the encumbered real property, which included the Triangle, recorded after October 16, 2001.

43. The SVA, by and through accepting a Deed in Lieu, . . . was then equitably subrogated to any and all rights and interest of MERS.

44. Ms. Eifrid then succeeded to the interests of the SVA by and through the quit-claim deed attached hereto as Exhibit "J."

45. Ms. Eifrid's interest in and to the Triangle is first and superior to any interest that Mr. Millikan may have.

46. Mr. Millikan's claimed interest in the Triangle constitutes a cloud upon Ms Eifrid's title to the Triangle.

Appellant's App. p. 34.

In light of the above, Eifrid sought a determination from the trial court that her legal title to the property is superior to any right, title, or interest that Millikan might claim. Moreover, Eifrid requested the trial court to foreclose and extinguish any purported interest in the Triangle that Millikan might have.

In the alternative, Eifrid requested that the trial court order specific performance for Millikan to exchange the Triangle for the Strip and enter judgment against Millikan for any and all direct, incidental, and consequential damages arising out of Millikan's failure to comply with the terms of the agreement reached between the parties. Eifrid also alleged that she relied on the agreement, has performed pursuant to the agreement,

7

and concluded that any repudiation of the agreement would lead to an unjust and fraudulent result.

On March 18, 2010, a bench trial commenced. During the trial, Millikan testified that he never had any intention of swapping or otherwise purchasing the Strip from Eifrid. In fact, Millikan denied that he had any intent to transfer the property. More particularly, Millikan testified that

> A. The intention was that if I get the money, I wouldn't even [have] bought that piece of property back. I woulda never bought the strip back. I woulda waited for it to go through a Sheriff's sale and everything else. I woulda never even [have] tried to buy it back.
>
> Q. So it's your testimony today that you offered to swap properties, that you had no intention of acquiring that strip of property did you?
>
> A. Well you couldn't swap it back if you didn't own it.

Tr. p. 15.

The trial court took the matter under advisement. On June 9, 2010, during the pendency of the case, Millikan attempted to transfer the disputed property to Turtle Town Plaza Rentals, LLC (Turtle Town). As of that date, the Whitley County Recorder identified Turtle Town as the owner of the disputed parcel of property, as a result of the sale from Millikan on June 9, 2010. Neither Eifrid nor the trial court knew of the purported transfer of the Triangle. In fact, Millikan denied any intent to transfer the property.

On July 2, 2010, Eifrid informed the trial court that "upon information and belief, the Plaintiff believes that Defendant Millikan may attempt to sell the property adjacent to

8

Ms. Eifrid, which may or may not include the portion(s) of property, which is the subject of this underlying lawsuit." In response, Millikan falsely professed to the trial court that "Defendant has no intention of selling any property which is the subject matter of this litigation and Plaintiff can make no factual argument for such claim." Appellee's App. p. 158. That assertion was made on July 6, 2010, less than one month after Millikan had already transferred ownership of the property to Turtle Town.

On September 29, 2010, the trial court issued judgment for Millikan and entered findings of fact and conclusions of law and determined that Eifrid should take nothing by way of her complaint. The trial court concluded, among other things, that

> 7. In correspondence dated March 11, 2008, Mr. Millikan through Mr. Smith made an offer to sell the triangle to Ms. Eifrid through Mr. Claxton for the sum of $35,000 on the condition that Eifrid disclaim any interest in the Strip.
>
> 8. In correspondence dated March 26, 2008, Ms. Eifrid made a counteroffer to purchase the triangle for $10,000 plus a disclaimer by Eifrid of any interest in the Strip.
>
> 9. In correspondence dated March 27, 2008, Mr. Millikan rejected the counteroffer made by Ms. Eifrid.
>
> 10. With regard to reversing the Swap there was no meeting of the minds and thus nothing was reduced to writing to be executed by both parties, and therefore there is no agreement to enforce.
>
> 11. Specific performance is not applicable to this case.
> . . .
> 13. Ms. Eifrid is not entitled to recover on a theory of equitable subrogation based upon a series of mortgage transactions and real estate transfers which were executed and recorded without the benefit of current surveys or proper title searches of the public records maintained by the recorder of Whitley County. A proper title search would have disclosed the

9

swap prior to Ms. Eifrid's acquisition of Parcel A and put her on notice that she was not acquiring title to the Triangle.

14. The Plaintiff shall take nothing by way of her complaint.

15. The Defendant is the owner in fee simple of the Triangle and is entitled to the quiet and peaceful possession of said property.

16. The Plaintiff is the owner in fee simple of the Strip and is entitled to the quiet and peaceful possession of said property.

Appellant's App. p. 16-17 (emphasis added).

On October 27, 2010, Eifrid filed a motion to correct error and motion to conform to the evidence. Eifrid asserted that giving "Millikan . . . clear title to the Trianagle and Lori Eifrid title to the Strip without any damages award, results in a terrible injustice to Lori Eifrid, an innocent purchaser of land, now encumbered by a spite strip." Appellant's App. p. 45. Eifrid pointed out that

> As Millikan readily admitted, neither he nor Ms. Eifrid owned clear title to the Strip at the time he proposed the swap. Accordingly, a swap could not occur unless or until one party actually obtained clear title to the Strip. Ms. Eifrid, through her counsel, notified Millikan that she was taking affirmative steps to acquire the property. Since Millikan failed to inform Ms. Eifrid that he was unwilling to swap, at that moment, Ms. Eifrid began to incur damages in the form of accruing attorney fees based upon Millikan's promise.

Id. at 48.

Eifrid also pointed out in her motion to correct error that she has lost the value of her agreement and the value of her home. And weighing the equities, Eifrid was an innocent purchaser, who simply failed to "obtain a title search that disclosed Millikan and

10

Maxey's plan to outwit the banks." Id. at 49. Thus, Eifrid maintained that she is entitled to the property through equitable subrogation.

As for the motion to conform to the evidence, Eifrid pointed out that Millikan admitted for the first time at trial that he had no intention of actually executing the swap that he proposed on March 27, 2008. Millikan also admitted that he was not seeking $30,000-$35,000, in order to obtain clear title from Maxey as proposed in the letter of March 27. Eifrid then asserted that Millikan intended to pocket the money as the property went into foreclosure.

In light of the above, Eifrid maintained that the trial court should permit an amendment to the pleadings to include fraud because it was apparent that Millikan "had no intention of swapping properties." Appellant's App. p. 51. Moreover, Eifrid contended that this additional element of fraud permits the recovery of treble damages and attorney fees.

As a result, Eifrid claimed that the trial court should

1. Order specific performance of the swap, including an award of incidental and consequential damages; and, or in the alternative,

2. Enter an award of damages in Ms. Eifrid's favor ($78,881.22— including treble damages) and attorney fees to be established by supplemental affidavit, as a result of Daniel Millikan's conduct.

Following a hearing, the trial court granted Eifrid's motion to correct error in part on August 19, 2011. In particular, the trial court determined that

3. Daniel Millikan was aware of the mortgage on the Eifrid property at the time he accepted the transfer from Maxey. The attempted transfer was

11

made during a clear gap period in the title commitment, and not communicated to Countrywide.

4. As a result of the refinance through Countrywide, the ABN AMRO mortgage was subsequently released.

5. Countrywide is entitled to application of the doctrine of equitable subrogation, insofar as it expected to receive a mortgage on the entire property. Indeed, it caused ABN AMRO's mortgage to be released on the entire property. Accordingly, Daniel Millikan's deed on the Triangle property was subject to Countrywide's mortgage. . . .

6. In consideration for the forgiveness of his financial obligation owed to Countrywide, Maxey executed a Warranty Deed in Lieu of Foreclosure in favor of the SVA. . . . Again, Countrywide's expectation was a security interest in the entire property, as evidenced by the legal description used in the deed.

7. Through the application of equitable subrogation, the SVA acquired the entire Triangle property. The Countrywide mortgage was therefore extinguished and released.

8. Lori Eifrid is the bona fide and innocent purchaser for value of the parcel of property from the SVA.

9. ABN AMRO had a valid mortgage on the entire parcel, including the Triangle property. Countrywide believed that it had acquired a mortgage on the entire property. The SVA believed that it had acquired the entire property. Millikan seeks to be declared the owner of the Triangle property. However, he participated in the very transaction made during the gap period; an effort to compromise the security of Countrywide.

12

Appellant's App. p. 24-25. As a result, the trial court ordered judgment against Millikan and awarded legal title of the Triangle to Eifrid that is "superior to any right, title, or interest that may be claimed by . . . Millikan or his successors in interest and any interest in and to the Triangle claimed by . . . Millikan or his successors in interest is foreclosed and extinguished." Id. at 25. Although the trial court did not find that Millikan had committed fraud, it ordered Millikan to pay Eifrid's attorney's fees in the amount of $13,343. Millikan now appeals.

## DISCUSSION AND DECISION

Millikan argues that the trial court erred in granting Eifrid's motion to correct error and awarding her the property. Specifically, Millikan claims that the trial court erroneously determined that the doctrine of equitable subrogation applied in these circumstances. Millikan also claims that the trial court erred in ordering him to pay Eifrid's attorney's fees.

## I. Standard of Review

When the trial court enters findings of fact and conclusions of law, said findings and conclusions control only the issues they cover. Barkwill v. Cornelia H. Barkwill Revocable Trust, 902 N.E.2d 836, 839 (Ind. Ct. App. 2009). Where such findings and conclusions are entered, we will apply a two tier standard of review, first determining whether the evidence supports the findings, and second, whether the findings support the judgment. Zukerman v. Montgomery, 945 N.E.2d 813, 818 (Ind. Ct. App. 2011). The trial court's specific findings will be set aside "only where they are clearly erroneous, that

13

is, when there are no facts or inferences drawn therefrom to support them." Lechien v. Wren, 950 N.E.2d 838, 841 (Ind. Ct. App. 2011).

The findings and conclusions must be liberally construed in support of the judgment, and they will be considered clearly erroneous only if a review of the entire record leaves us with a definite and firm conviction that a mistake has been made. Skweres v. Diamond Craft Co., 512 N.E.2d 217, 219 (Ind. Ct. App. 1987). Only the evidence favorable to the judgment and all reasonable inferences flowing therefrom is considered, and the evidence is not reweighed, nor is the credibility of witnesses assessed.

Any facts or issues not covered by specific findings are governed by a general judgment standard of review, and such will be upheld on any basis supported by the record. Nelson v. Marchand, 691 N.E.2d 1264, 1267 (Ind. Ct. App. 1998). On the other hand, we will review questions of law de novo, and we owe no deference to the legal conclusions drawn by the trial court. Lechien, 950 N.E.2d at 841.

## II.  Millikan's Claims

### A.   Equitable Subrogation

In Bank of New York v. Nally, 820 N.E.2d 644, 651 (Ind. 2005), our Supreme Court observed that the doctrine of equitable subrogation

> sometimes misleadingly called 'legal subrogation,' has been recognized in Indiana for over a century.  Subrogation arises from the discharge of a debt and permits the party paying off a creditor to succeed to the creditor's rights in relation to the debt.  It arises by operation of law, that is to say it is

created by the legal consequences of the acts and relationships of the parties, and thus is a legal fiction.

Additionally, one who acquires or succeeds to rights, claims, or securities through equitable subrogation steps into the shoes of the subrogor and takes them burdened with the defenses, limitations, and disqualifications to which they were subject. Id.

> In Gibson v. Neu, 867 N.E.2d 188, 198 (Ind. Ct. App. 2007), we observed that
>
> [T]he purpose of equitable subrogation is to avoid an unearned windfall. Other equitable considerations include the absence of any prejudice to the interest of junior lienholders. The court noted that "[n]either negligence nor constructive notice of an existing lien is relevant to whether the junior lien holder will be unjustly enriched or prejudiced. Rather, the basis for subrogation in this context is the lender's justified expectation of receiving [a] security interest in the property."

Id. (internal citations omitted).

In this case, Millikan asserts that at no time during the proceedings did Eifrid assert that Millikan received an unearned windfall, or was somehow unjustly enriched. Because Millikan swapped property with Maxey, he no longer has an interest in the Strip. As a result, Millikan maintains that because there has been no allegation or proof of a windfall, the doctrine of equitable subrogation should not apply and Eifrid should not be awarded the property.

Notwithstanding these contentions, the evidence is undisputed that when Millikan acquired the Triangle property from Maxey, Millikan knew that the Triangle was encumbered by the ABN AMRO mortgage. Appellant's App. p. 24. The doctrine of

15

equitable subrogation acts to preclude Millikan and Maxey from circumventing Countrywide's mortgage on the entire property.

In our view, Countrywide stepped into the shoes of ABN AMRO by paying off the original mortgage. Therefore, Countrywide's interest in the property was not taken subject to Millikan's interest, and Countrywide retained a mortgage interest in all of the property, including the Triangle.

By way of illustration, when Maxey defaulted on his loan on the entire property, he provided a warranty deed to Countrywide, effectively conveying to it any and all interest that Maxey had in the property. Taking into account the fact that, through equitable subrogation, Countrywide also held a security interest in and to the property, including the Triangle, Countrywide then became vested with ownership of the property in its entirety. And having discharged the Countrywide debt, the SVA stepped into Countrywide's shoes. Accordingly, when the SVA transferred all of its interest to Eifrid, she acquired ownership of both Parcel A and the Triangle.

In effect, the doctrine of equitable subrogation acts to prevent Millikan's orchestrated transfer of the Triangle from somehow preventing the mortgage encumbrance thereon from transferring from ABN AMRO to Countrywide. That same effect follows through the chain of title to the Triangle that ultimately rests with Eifrid.

We note that while Millikan suggests that the doctrine of equitable subrogation should not apply because Eifrid is not a lending institution, he directs us to no authority for that proposition, and we have found none. Indeed, equitable subrogation is a highly

16

favored doctrine that demands liberal application, and nothing in Nally commands that the doctrine should apply only to a lending institution. Even more compelling, we must conclude that an innocent bona fide purchaser, such as Eifrid, should be afforded the same, if not greater, protection that is afforded to a lending institution such as Countrywide.

We also reject Millikan's argument that the doctrine of equitable subrogation should not apply because Eifrid's receipt of a quitclaim deed from the SVA in some way placed her on constructive notice of Millikan's claim to the Triangle. As the trial court observed:

> ABN AMRO had a valid mortgage on the entire parcel, including the Triangle property. Countrywide believed that it had acquired a mortgage on the entire property. The SVA believed that it had acquired a mortgage on the entire property . . . but that [Millikan] participated in the very transaction made during the gap period: an effort to compromise the security of Countrywide.

Appellant's App. p. 25.

In our view, this factor clearly weighs in favor of applying the doctrine of equitable subrogation. While Millikan argues that Eifrid and the SVA should have known of the swap on June 17, 2003 through the exercise of reasonable diligence, constructive knowledge is not sufficient to preclude the application of equitable subrogation. See Nally, 820 N.E.2d at 655 (observing that mere negligence in the failure to discover a particular mortgage does not rise to the level of culpability).

There is no showing that Eifrid, Countrywide, or the SVA are culpably negligent in failing to discover the improper June 17, 2003 swap of the property. Indeed, the trial court did not make any finding that either Eifrid or Countrywide was negligent, and Millikan did not present any evidence of culpable negligence. To the contrary, the trial court found that Eifrid was an innocent purchaser. She, along with the many others before her, all took interest to the entire property without knowledge of the purported partition by Millikan to prevent access to the adjacent cul de sac.

Indeed, every document of conveyance beginning with Eifrid's deed from the SVA continuing back to the mortgage held by ABN AMRO contained the Triangle property. Even if it could be said that Eifrid did not discover the deed to Millikan that was recorded on the date that the refinance was closed, her failure to do so is far from the requisite culpable negligence expressed in Nally that would prevent the doctrine of equitable subrogation from applying.

Also, Millikan received only a quitclaim deed of the Triangle from Maxey. In doing so, Millikan, himself, was on notice that his claim to the Triangle was subject to ABN AMRO's mortgage interest in Parcel A and the Triangle—then a single tract of real property and an interest of which Millikan was well aware. Appellant's App. p. 24. When Millikan agreed to acquire the Triangle, he never provided any evidence of a reasonable expectation of receiving clear title to the Triangle. Indeed, it was impossible for the Triangle to be conveyed without being accompanied by the ABN AMRO mortgage.

18

Finally, we reject Millikan's claim that there was no evidence that he would have received a windfall by acquiring title to the Triangle. Again, Millikan accepted title to the Triangle with full knowledge that the property was encumbered by the ABN AMRO mortgage. Millikan did not extinguish the ABN AMRO or the Countrywide mortgage. Rather, Millikan waited until the day of closing of the Countrywide refinancing before recording his claimed interest. In light of these circumstances, it is apparent that Millikan is now seeking the windfall of clear title and an extinguished mortgage without any additional consideration. The trial court's order prevents such a windfall, and we conclude that the doctrine of equitable subrogation was properly applied in these circumstances. Therefore, the trial court properly granted Eifrid's motion to correct error with respect to the ownership of the property.

## B. Attorney Fees

Millikan next argues that the trial court abused its discretion in ordering him to pay Eifrid's attorney fees. Millikan maintains that Eifrid's request for the award of fees was not timely, in that the request was made for the first time in the motion to correct error and the motion to conform to the evidence.

Notwithstanding Millikan's contentions, Eifrid requested attorney fees that were included in her proposed findings of fact and conclusions of law. However, as noted above, the trial court did not find that Millikan committed fraud or conversion that might

19

warrant the award of attorney fees.[1]  Thus, Eifrid was not entitled to recover attorney fees

on that basis.

Finally, it is apparent that the trial court relied on Indiana Code section 34-52-1-1

as the basis for awarding of attorney fees to Eifrid, which provides that

> (a) In all civil actions, the party recovering judgment shall recover costs, except in those cases in which a different provision is made by law.
>
> (b) In any civil action, the court may award attorney's fees as part of the cost to the prevailing party, if the court finds that either party:
>
>> (1) brought the action or defense on a claim or defense that is frivolous, unreasonable, or groundless;
>>
>> (2) continued to litigate the action or defense after the party's claim or defense clearly became frivolous, unreasonable, or groundless; or
>>
>> (3) litigated the action in bad faith.
>
> (c) The award of fees under subsection (b) does not prevent a prevailing party from bringing an action against another party for abuse of process arising in any part on the same facts.  However, the prevailing party may not recover the same attorney's fees twice.

As noted above, the trial court initially determined that Eifrid should take nothing

by way of her complaint.  However, the trial court subsequently granted Eifrid's motion

to correct error in part.  Indeed, the trial court acknowledged that it "struggled" with the

issue of whether the doctrine of equitable subrogation applied, and obviously found the

case and issues involved to be complex. Tr. p. 102.  As a result, there is no showing that

---

[1] For instance, Indiana Code section 34-24-3-1 provides in part that if a person has an "unpaid claim on a liability that is covered by IC 24-4.6-5 or suffers a pecuniary loss as a result of a violation of IC 35-43, IC 35-42-3-3, IC 35-42-3-4, or IC 35-45-9," the person may recover treble damages, costs of the action, and attorney fees.

20

Millikan's defense of the matter was frivolous, groundless, or unreasonable. Millikan only continued to litigate the matter after the issuance of the September 29, 2010 findings of fact, conclusions of law, and judgment, because of Eifrids's actions that involved the filing of additional motions. And the trial court never stated or alluded to an idea that Millikan was litigating the matter in bad faith. Thus, Indiana Code section 34-52-1-1 does not apply in these circumstances, and the trial court's determination that Millikan should pay Eifrid's attorney fees cannot stand.

The judgment of the trial court is affirmed in part, reversed in part, and remanded with instructions that the award of attorney fees in Eifrid's favor be vacated.

KIRSCH, J., and BROWN, J., concur.