## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED
Jul 06 2018, 8:39 am
CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Nathan D. Hoggatt
Fort Wayne, Indiana

ATTORNEY FOR APPELLEES

Dawn M. Boyd
Law Office of Dawn M. Boyd
Columbia City, Indiana

## IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Susan Tennant, | July 6, 2018 |
| *Appellant-Defendant/Counter-Plaintiff,* | Court of Appeals Case No. 92A04-1710-CC-2474 |
| v. | Appeal from the Whitley Circuit Court |
| Peaks & Valleys, Inc., and Toni Staples, | The Honorable Matthew J. Rentschler, Judge |
| *Appellees-Plaintiffs/Counter-Defendants* | Trial Court Cause No. 92C01-1505-CC-201 |

**Baker, Judge.**

Susan Tennant hired Peaks & Valleys, Inc. (P&V), to construct a pole building on her property.  As the construction was nearing completion, Tennant fired P&V and refused to pay for its work.  P&V filed a complaint against Tennant, and Tennant filed a counterclaim against P&V.  A bench trial took place, and now both parties appeal.  Tennant argues that the trial court erred in its application of the Home Improvement Contracts Act (HICA);[1] P&V argues that the trial court erred by denying its motion for prejudgment interest; and both parties argue that the trial court erred in its attorney's fee award to P&V.  Finding that the trial court did not err in its application of HICA or in its attorney's fee award, but that the trial court erred by denying P&V's request for prejudgment interest, we affirm in part, reverse in part, and remand.

# Facts[23]

### The Project

---

[1] Ind. Code § 24-5-11-1 et. seq.

[2] We commend and thank the trial court for its thorough order.

[3] The purpose of our appellate rules, especially Indiana Appellate Rule 46, is to aid and expedite review and to relieve the appellate court of the burden of searching the record and briefing the case.  *Thacker v. Wentzel*, 797 N.E.2d 342, 345 (Ind. Ct. App. 2003).  The briefs in this case violate several provisions of our appellate rules, which impedes our ability to expeditiously consider the issues.

First, the briefs for both parties violate Rule 46(A)(5) by omitting some citations in their statements of the case.  Second, Tennant's brief violates Rule 46(A)(6)(a), (b), and (c) because many facts in the statement of facts are unsupported by citations, the facts are not stated in accordance with the appropriate standard of review, and the statement is at times argumentative, rather than in a narrative form.  P&V's brief similarly fails to include citations for certain facts.  Third, Tennant's brief violates Rule 46(A)(8)(a) because the brief contains contentions that are not supported by cogent reasoning or by citations to the authorities.  Fourth, although Rule 46(D)(3) provides that the "appellant's reply brief *shall* address the arguments raised on cross-

[2] Tennant owns a farm in Whitley County. P&V is a roofing and construction company. Its owner, sole shareholder, and president is Toni Staples. Sometime in May 2014, Tennant told P&V that she wanted a pole building constructed on her property (the Project) and some land cleared. On or around May 15, 2014, P&V presented Tennant with a written estimate of $33,812 for the Project and the land clearing. The estimate was based on the pole building as a basic structure—a frame, metal siding, a roof, a cement slab, three garage doors, and a regular door—with an unfinished interior and no plumbing or electricity. Tennant understood and agreed to the terms of the estimate. Tennant did not sign the estimate, nor did the parties put their agreement in a written, signed contract.

[3] P&V spent ten days clearing the land. On or around August 22, 2014, P&V began the Project. P&V purchased supplies on credit from a third-party business (the Supplier), expecting to repay the Supplier once Tennant paid for the Project. On August 26, 2014, Tennant paid P&V $6,000 for the clearing work.

[4] By early September, P&V was ready to prepare and pour the concrete slab for the Project. Around this time, Tennant requested certain modifications and upgrades—including relocating the Project and adding water and electric lines—to the Project, which resulted in increased material and labor costs and

appeal," (emphasis added), Tennant's reply brief fails to mention any of the issues that P&V raises on its cross-appeal. Instead, the reply brief is a near-verbatim reiteration of sections of her initial brief.

delayed the Project. P&V informed Tennant that the requested changes would increase the Project's cost and timeline; Tennant verbally agreed to pay for the additional costs. P&V made changes and incurred expenses based on these requests.

[5] Around the middle of October 2014, P&V once again began to prepare the concrete site. Tennant then told P&V that she wanted to increase the depth of the concrete slab from four to six inches. This change required P&V to adjust the building frame. On October 23, 2014, the stone fill for the concrete was delivered. On October 24, 2014, P&V's concrete subcontractor placed the stone fill in the building frame and graded it. Meanwhile, Tennant and P&V mutually agreed to allow Tennant to have a different contractor lay the concrete, and on October 24, 2014, Tennant began contacting other contractors. She hired Barry Myers and Roger Conrad to pour the building's concrete slab by separate agreement.

[6] By early November, P&V had completed most of the work for the Project. When Myers and Conrad worked on the concrete, they chose to remove and replace the concrete fill that P&V had installed because it was saturated and muddy. P&V was not permitted to work on the Project while the concrete was being poured. On November 11, 2014, Tennant called Staples and fired P&V from the Project. When P&V's subcontractors returned to the Project to finish the few remaining tasks, Tennant told them they were fired and ordered them to leave her property. Tennant refused to pay P&V for the Project. As a result, P&V was unable to repay the Supplier and accrued interest on its debt to the

Supplier; P&V then took out a loan at a lower interest rate to mitigate its damages.

*Procedural History*

On December 4, 2014, P&V filed a mechanic's lien on the Project for $33,511.39. At some point, P&V admitted to an error in the amount and excluded certain materials, reducing the amount of the lien to $26,511.39. On May 13, 2015, P&V and Staples filed a complaint against Tennant, alleging breach of contract and other claims. P&V also sought to foreclose on its mechanic's lien. On July 20, 2015, Tennant filed counterclaims against P&V, alleging breach of contract, slander of title, and other claims. On March 30, 2016, Tennant amended her counterclaims, adding an allegation of failure to comply with HICA. On June 12, 2017, P&V amended its complaint, adding an allegation of abuse of process. On June 28, 2017, Tennant filed a motion for discovery sanctions. During the pleading stage, both parties requested attorney's fees.

A bench trial took place on July 18-21, 2017. On August 10, 2017, the trial court issued its findings of fact and conclusions of law. Its findings of fact included the following:

> 12. The Court finds that the parties intended that the clearing work—and only the clearing work—was paid in full by [Tennant's] $6000.00 payment.

> ***

29.  On Tuesday, November 11, 2014, Mrs. Tennant fired Peaks & Valleys via telephone call to Toni Staples.

30.  Mrs. Tennant disputes that she fired Peaks & Valleys.

31.  Subcontractors of Peaks & Valleys returned to finish the roof and siding on or about November 12, 2014 when Mrs. Tennant approached them and ordered them to leave her property.

32.  Mrs. Tennant disputes that she ordered anyone associated with Peaks & Valleys to leave the property.

***

37.  Peaks & Valleys spent 16.5 days working on the pole barn project.

38.  Peaks & Valleys filed its Notice of Intent to Hold Mechanic's Lien on December 4, 2014 for $33,511.39.

39.  Peaks & Valleys admits to an error in the Mechanic's Lien . . . which inflated the lien by $4000.00.

40.  Mrs. Tennant brought other contractors in to finish the building and make improvements not contemplated by her dealings with Peaks & Valleys. . . .

41.  Mrs. Tennant refused to pay Peaks & Valleys for the services and materials rendered to erect the pole building.  While there was negotiation and mediation between the parties, Mrs. Tennant refused to pay any of the money—even the thousands of dollars she acknowledged she owed for material that Peaks & Valleys had purchased and incorporated into her building.

***

43. Due to Mrs. Tennant's non-payment, Peaks & Valleys lost its line of credit with its local supplier, . . . and incurred substantial interest on materials provided to Mrs. Tennant.

44. The undisputed value of materials provided by Peaks & Valleys to Mrs. Tennant is $13,328.29.

45. Labor costs owed in this case are difficult to calculate for many reasons. First, the Court is cognizant that Peaks & Valleys—like any small business—is required to make a profit[] for its owner (Toni Staples), but cannot label it as such in their estimate. Thus, a contractor inflates certain items in their estimate and utilizes this inflation to realize their profit. Therefore, it is difficult to assess an appropriate measurement of labor cost and profit from the estimate in this case.

46. It is even more difficult in this case to assess labor and profit because there were changes and additions to the project which increased the amount of labor from what was expected in the estimate. Of course, there was also an early exit for Peaks & Valleys that saved them a couple of days of additional labor.

47. At trial, Peaks & Valleys presented evidence that 16.5 days were expended on putting up the pole barn and that each day, Peaks & Valleys endeavors to earn $1,000.00 per day. Ipso facto, Peaks & Valleys claims that they are due $16,500.00. The $1,000.00 per day figure is not convincing, however, as the Court interprets this figure as the business' goal which is not always achieved. . . .

48. During those 16.5 days, Peaks & Valleys had on average three subcontractor laborers working on the project. There was

testimony that Peaks & Valleys paid their laborers at least $100.00 per day . . . .

49. Mrs. Tennant saw fit to pay Peaks & Valleys $6000 for the clearing project which took at most 10 days to complete. If Peaks and Valleys utilized three laborers and presumed that the business would pay its owner at least as much as the laborers, we can calculate that the laborers and Toni Staples were paid at least $150.00 per person per day ($6000/10 = $600 per day; $600.00/4 wages = $150.00 per person per day.)

50. This Court determines based upon the acceptable rate of pay on the clearing project that a fair rate of pay for the laborers on this project is $150.00 per day. Thus, labor costs were $450.00 per day for 16.5 days for a total of $7,425.00. The Court finds that Peaks & Valleys is also entitled to $150.00 per day in "profit" for owner Toni Staples for coordinating and supervising the project for a total of $2,475.00. The total that Peaks & Valleys is therefore due for labor and profit is $9,900.00.

51. In addition to these damages, Peaks & Valleys suffered the loss of ability to pay off their line of credit with [the Supplier]. As a direct result of Mrs. Tennant's refusal to pay, Peaks & Valleys paid 18% interest on the outstanding balance it carried with [the Supplier]. Peaks & Valleys paid a total of $8,900.00 in interest to [the Supplier] beginning in December of 2014. Peaks & Valleys eventually mitigated its losses by undertaking [a loan with a lower interest rate to pay off the Supplier]. Peaks & Valleys contends the interest paid (a total of $10,777.92) is damage attributable to Mrs. Tennant's failure to pay for her pole barn.

Appealed Order p. 2-8.

On P&V's breach of contract claim and its mechanic's lien, the trial court concluded that:

- An oral agreement based on the estimate existed between P&V and Tennant, and Tennant terminated that agreement when she was no longer willing to accept work from P&V.
- The agreement was not unenforceable just because it did not completely comply with HICA.
- P&V is entitled to recover damages for labor and materials, totaling $23,228.29; P&V is entitled to prejudgment interest totaling "roughly $5,000.00," *id.* at 9; and P&V is entitled to interest costs of $10,777.92 for money it borrowed to cover its losses, a proximately caused damage.
- Awarding prejudgment interest and proximately caused interest costs would constitute unfair double-dipping. P&V is entitled to only the greater of the two; hence, P&V is entitled to $10,777.92 but not the $5,000 of prejudgment interest.
- Thus, P&V could enforce its mechanic's lien for a total of $34,006.21.

As for P&V's abuse of process claim, the trial court gave Tennant "the benefit of doubt and finds insufficient basis for an abuse of process claim. Most of Mrs. Tennant's legal claims are ultimately without merit, but this Court stops short of finding that the filings were so lacking in a legal foundation that they amount to abuse of the legal process." *Id.* at 10-11.

On Tennant's claims, the trial court concluded as follows:

- The trial court denied Tennant's breach of contract claim, concluding that P&V did not breach its contract "and only left the project unfinished when they were not welcome to return." *Id.* at 11.
- The trial court denied Tennant's slander of title claim, concluding that she did not quantify any loss as the result of P&V's overstatement of its claim on its mechanic's lien.

- On Tennant's claim under HICA, the trial court concluded that Tennant prevailed because P&V operated contrary to HICA when it did not reduce their agreement to writing; that Tennant suffered no perceptible damages because of P&V's failure to comply with HICA; and that "[i]f the original estimate had been reduced to a contract, and if each modification had been further reduced to writing, it is unlikely—or at least highly speculative—that any events would have happened differently." *Id.* at 12. The trial court awarded Tennant the minimum statutory award of $500.
- The trial court denied Tennant's motion for discovery sanctions, finding no proof that any discovery violations occurred.

Regarding attorney's fees, the trial court found that P&V incurred more than $80,000 in attorney's fees, and Tennant more than $112,000; that P&V's request for attorney's fees carried more weight than Tennant's because the mechanic's lien statute entitles a plaintiff who recovers a judgment to attorney's fees; and that a "reasonable attorney fee for pursuing a roughly $34,000.00 mechanic's lien is $10,000.00." *Id.* at 14.

On September 6, 2017, P&V filed a motion to correct error, arguing that the trial court erred by denying P&V prejudgment interest, its abuse of process claim, and its full request for attorney's fees; and by awarding Tennant $500 under HICA. On October 5, 2017, the trial court issued an order affirming its judgment regarding the prejudgment interest and the abuse of process claim. The trial court reversed its judgment on Tennant's $500 award under HICA, finding that she was not entitled to an award because P&V did not act with intent to defraud or mislead and because Tennant did not provide sufficient and

timely notice about P&V's noncompliance as required by the statute. As for the attorney's fees, the trial court found as follows:

14. This Court is likewise concerned with a property owner's ability to contest a mechanic's lien when, as in this case, the ultimate cost in terms of labor and materials for an interrupted project are legitimately in dispute. Forcing Tennant to pay 100% of Peaks & Valleys' legal costs in addition to Tennant's own would be an excessive systemic discouragement to property owners facing a mechanic's lien for an amount with which they did not agree and whose disagreement proves to have some merit.

***

19. This Court acknowledges that its' [sic] original $10,000.00 attorney fee award was an arbitrary figure based upon the relative merits of Peaks & Valleys' litigation . . . and the size of Peaks & Valleys' potential (roughly $40,000) and actual ($34,006.21) award. This Court's $10,000.00 award was mainly reactionary to the incongruity between the award and the legal costs, and it was contrary to the law and logic of [caselaw].

20. To hunt and peck through Peaks & Valleys' fee statement to determine which charges were reasonably necessary to the litigation—and which were not—is an impossible task. Which charges relate to the mechanics' lien error? Do we allow the billable hours during which counsel pursued claims where she was ultimately successful and disallow billable hours when she was arguing claims where she was unsuccessful? Which hours relate to claims where Tennant did not prevail, but did have a reasonable dispute? Accounting for "reasonable" and "reasonably necessary" charges is too subjective and insufficiently quantified to lend itself to itemization on the record available to this Court.

21. . . . [I]n light of the law and logic of [caselaw], and with consideration given to avoiding unnecessary discouragement of legitimate litigation, and given the Court's assessment that 60% of Peaks & Valleys' attorney fees were reasonably necessary to the litigation and/or responsive to unsuccessful counterclaims or litigation tactics on the part of Tennant, the Court . . . now awards 60% of Peaks & Valleys [sic] requested award: $82,236.86 x .60 = $49,342.11.

Appellant's App. Vol. V p. 135-37.  Tennant and P&V now appeal.

# Discussion and Decision

Tennant raises multiple issues on appeal, which we consolidate and restate as whether the trial court erred in its application of HICA.[4]  On cross-appeal, P&V

---

[4] Tennant's other issues are not supported by cogent argument or appropriate authority.  Tennant argues that the trial court erred by determining that P&V's mechanic's lien was a valid lien on which it could foreclose.  On appeal, she argues that the lien is invalid because Staples, in her individual capacity, rather than P&V, filed it; however, she argued to the trial court that the lien was invalid because P&V overstated the amount of its claim.  An argument raised for the first time on appeal is waived.  *E.g.*, *Troxel v. Troxel*, 737 N.E.2d 745, 752 (Ind. 2000).  Therefore, we will not consider this argument.

Tennant also contends that the trial court erred by denying her claim of slander of title.  The trial court found that Tennant failed to quantify any loss because of P&V's overstatement of its claim on the mechanic's lien.  To demonstrate slander of title, one must prove "false statements were made, with malice, and that the plaintiff sustained pecuniary loss as a necessary and proximate consequence of the slanderous statements." *Bixeman v. Hunter's Run Homeowners Ass'n of St. John, Inc.*, 36 N.E.3d 1074, 1078 (Ind. Ct. App. 2015) (citation omitted).  On appeal, Tennant does not argue that P&V made false statements with malice or that she sustained any financial loss as a result of any statement.  Her argument is unavailing.

Tennant then challenges the trial court's award of damages to P&V.  We employ a limited standard of review when addressing challenges to a trial court's calculation and award of damages. *Prime Mortg. USA, Inc. v. Nichols*, 885 N.E.2d 628, 656 (Ind. Ct. App. 2008).  We do not require mathematical certainty in awarding damages as long as the amount awarded is supported by evidence in the record.  *Id*.  First, Tennant argues that no award of consequential damages is warranted in this case but she offers no statutory authority or caselaw to support her position.  Tennant then argues that the trial court failed to consider three invoices when calculating damages; the trial court denied their admission under Indiana Rule of Evidence 408, which prohibits the admission of compromise offers and negotiations, and Tennant does not present a cogent argument that the trial court erred by excluding them as evidence.  Lastly, Tennant argues that the trial court erred when calculating damages for labor, but again, she provides no statutory authority or caselaw to

argues that the trial court erred by denying P&V prejudgment interest.[5] In addition, both parties contest the trial court's award of attorney's fees.

# I. Standard of Review

When the trial court enters findings of fact and conclusions of law, we will apply a two-tier standard of review, first determining whether the evidence supports the findings, and second, whether the findings support the judgment. *Millikan v. Eifrid*, 968 N.E.2d 243, 251 (Ind. Ct. App. 2012). The trial court's specific findings will be set aside only where they are clearly erroneous, that is, when there are no facts or inferences drawn therefrom to support them. *Id.* Only the evidence favorable to the judgment and all reasonable inferences flowing therefrom is considered, and the evidence is not reweighed, nor is the credibility of witnesses assessed. *Id.*

---

support this argument. The trial court provided clear reasoning to show why and how it calculated P&V's damages award, and we find no error with its calculation.

Finally, Tennant asserts that the trial court erred by denying her motion for sanctions for discovery violations. According to Tennant, during discovery, P&V misstated the Project's start date, was unclear about whether it purchased garage doors for the Project, misstated the number of documents it presented to Tennant, and withheld material evidence. Despite a lengthy discussion, however, Tennant provides no statutory authority or caselaw to support her claims that any of these allegations constitute discovery violations. It is well settled that we will not consider an appellant's assertion on appeal when she fails to present cogent argument supported by authority. *E.g.*, *Thacker*, 797 N.E.2d at 345. Moreover, Tennant does not identify any prejudice she suffered because of these perceived violations. We find no error on this basis.

[5] P&V also argues that the trial court erred by denying its claim of abuse of process. Although the trial court found that "[m]ost of Mrs. Tennant's legal claims are ultimately without merit," the trial court "stop[ped] short of finding that the filings were so lacking in a legal foundation that they amount to abuse of the legal process." Appealed Order p. 10-11. P&V asserts that the trial court applied the wrong legal standard when it made this finding, but is unclear about how the trial court's legal standard was wrong. The trial court declined to find that P&V met its burden to show that Tennant misused the legal process. We decline to second-guess the trial court's judgment on this issue.

# II. Tennant's Appeal

Tennant argues that the trial court erred by finding that P&V's noncompliance with HICA did not make their contract unenforceable and by denying Tennant an award under the Act.

# A. The Act

The purpose of HICA

> is to protect consumers by placing specific minimum requirements on the contents of [real property] improvement contracts . . . [because] few consumers are knowledgeable about the [real property] improvement industry or of the techniques that must be employed to produce a sound structure. The consumer's reliance on the contractor coupled with well-known abuses found in the [real property] improvement industry, served as an impetus for the passage of [HICA], and contractors are therefore held to a strict standard.

*Imperial Ins. Restoration & Remodeling, Inc. v. Costello*, 965 N.E.2d 723, 727 (Ind. Ct. App. 2012). HICA requires real property improvement suppliers[6] performing any alteration, repair, or modification to residential real property—which includes all fixtures to, structures on, and improvements to the real property—of a consumer[7] for an amount greater than $150 to provide the

---

[6] A "real property improvement supplier" is "a person who engages in or solicits real property improvement contracts whether or not the person deals directly with the consumer." I.C. § 24-5-11-6. P&V does not dispute on appeal that it is a real property improvement supplier subject to HICA.

[7] A "consumer" is a person who owns, leases, or rents the residential real property that is the subject of a real property improvement contract. I.C. § 24-5-11-2. P&V does not dispute that Tennant is a consumer.

consumer with a written home improvement contract. I.C. §§ 24-5-11-1, -3, -4, -10(a). The home improvement contract must contain certain information before it is signed by the consumer, including the consumer's name, the address of the real property that is the subject of the real property improvement, a reasonably detailed description of the proposed real property improvements, approximate starting and completion dates, a statement of any contingencies that would materially change the approximate completion date, and the contract price. I.C. § 24-5-11-10(a).

[17] A real property improvement supplier who violates HICA commits a "deceptive act" that is actionable by a consumer and subject to the remedies and penalties available to victims of deceptive consumer sales. I.C. § 24-5-11-14. Specifically, "[a] person relying upon an uncured or incurable deceptive act may bring an action for the damages actually suffered as a consumer as a result of the deceptive act or five hundred dollars ($500), whichever is greater."[8] I.C. § 24-5-0.5-4(a). "[T]he court may void or limit the application of contracts or clauses resulting from deceptive acts . . . ." I.C. § 24-5-0.5-4(d). The statute then limits its application, stating that:

> No action may be brought under this chapter, . . . unless (1) the deceptive act is incurable or (2) *the consumer bringing the action*

---

[8] An "uncured deceptive act" is a deceptive act of which the consumer gave proper notice to the supplier and either the supplier made no offer to cure within thirty days, or the act has not been cured within a reasonable time after the consumer's acceptance of the offer to cure. I.C. § 24-5-0.5-2(a)(7). An "incurable deceptive act" is a deceptive act done by a supplier as part of a scheme, artifice, or device with intent to defraud or mislead. I.C. § 24-5-0.5-2(a)(8).

*shall have given notice in writing* to the supplier within the sooner of (i) six (6) months after the initial discovery of the deceptive act, (ii) one (1) year following such consumer transaction, or (iii) any time limitation, not less than thirty (30) days, of any period of warranty applicable to the transaction, *which notice shall state fully the nature of the alleged deceptive act and the actual damage suffered therefrom*, and unless such deceptive act shall have become an uncured deceptive act.

Ind. Code § 24-5-0.5-5(a) (emphases added).

[18]   This Court has concluded that the General Assembly did not intend that every contract that violates HICA is automatically void. *Costello*, 965 N.E.2d at 729. Instead, we apply a balancing approach and examine the factors that courts use to determine whether a contract contravenes declared public policy. *Id.* The considerations to be balanced are (1) the nature of the subject matter of the contract, (2) the strength of the public policy underlying the statute, (3) the likelihood that refusal to enforce the bargain or term will further that policy, (4) how serious or deserved would be the forfeiture suffered by the party attempting to enforce the bargain, and (5) the parties' relative bargaining power and freedom to contract. *Id.*

## B. Application

[19]   Tennant argues that P&V did not comply with HICA because no formal written contract existed between the parties. In the alternative, Tennant asserts that P&V's "failure to adhere to legislative mandates has caused Tennant so much time, money, and emotional grief" that their agreement must be declared void.

Appellant's Br. p. 28. P&V concedes that the written estimate did not conform to HICA's requirements, but asserts that because the omissions were not intentional and did not prejudice Tennant, their agreement should not be found unenforceable.

[20] Here, Tennant suggests that no contract existed between the parties because their agreement was not reduced to writing. The trial court found that the estimate served as a written contract in that it "outlined the terms and parameters of the project to which Mrs. Tennant orally agreed and upon which Peaks & Valleys proceeded. The estimate establishes generally what both parties agreed to be reasonable terms and expectations." Appealed Order p. 8. In other words, the trial court found that a contract existed because the essential elements of a contract were present. *See*, *e.g.*, *Jernas v. Gumz*, 53 N.E.3d 434, 445 (Ind. Ct. App. 2016), *trans. denied* ("The basic requirements for a contract are offer, acceptance, consideration, and a meeting of the minds between the contracting parties on all essential elements or terms of the transaction."). Tennant does not refute the trial court's finding beyond a general statement that no written agreement evinces the meeting of the minds. The trial court did not err by finding that a written contract existed.

[21] To find this contract unenforceable against Tennant would leave P&V suffering "a serious and undeserved forfeiture outweighing the other factors." *Costello*, 956 N.E.2d at 729. P&V provided services to Tennant at her request and accommodated her modification requests during the Project. The Project was near completion when Tennant fired P&V. Tennant acknowledged that she

received the benefit of P&V's services and that she owes P&V for its work. Tr. Vol. III p. 239-40; Appellant's App. Vol. II p. 153, 158, 160-61.

[22] Moreover, Tennant fails to show that she was deceived by P&V's noncompliance with HICA. The trial court concluded that even if the original estimate had been reduced to a formal written contract, it was speculative that events would have happened differently. We find the trial court's reasoning sound. Even if P&V had complied with HICA, Tennant fails to show how the Project would have proceeded differently. She does not argue that she would have requested fewer or no modifications, or that she would have paid for the work and materials P&V had expended before she fired it. In short, she fails to show how P&V's failure to comply with the statute led to any deception or abuse of her as a consumer. "HICA aims to protect consumers from abuse, not to provide an escape from legitimate contractual obligations." *Paul v. Stone Artisans, Ltd.*, 20 N.E.3d 883, 889 (Ind. Ct. App. 2014). Not enforcing this contract would not further the policy behind HICA and would simply allow Tennant to enjoy a windfall. The trial court did not err by finding that a valid contract existed between the parties despite P&V's noncompliance with HICA.[9]

[23] As for damages, the trial court initially awarded Tennant $500, the minimum award for a HICA violation. After P&V filed its motion to correct error, the

---

[9] Tennant also contends that her oral modifications to the contract did not comply with HICA. Tennant does not identify which modifications she is referencing. However, as the trial court did not make any findings of fact or conclusions of law related to modifications under HICA, it appears that Tennant is raising this issue for the first time on appeal. It is, therefore, waived. *Troxel*, 737 N.E.2d at 752.

trial court reversed its judgment, finding that the deceptive act was not incurable because P&V did not act with intent to defraud or mislead and that "Tennant failed to provide sufficient and timely notice under the statute so that she could later claim that she was the victim of an 'uncured deceptive act[.]'" Appellant's App. Vol. V p. 133-34. Tennant now argues that she was entitled to damages.

[24] We agree with the trial court's finding. Indiana Code section 24-5-0.5-5(a) states clearly that an action cannot be brought under HICA unless the deceptive act is incurable (meaning that it was done by the real property improvement supplier as part of a scheme, artifice, or device with intent to defraud or mislead) or unless the consumer bringing the action gives written notice to the real property improvement supplier within a certain timeframe that states the nature of the alleged deceptive act and the actual damage suffered from it. Tennant does not argue that the deceptive act was incurable. Instead, she contends that she met the statutory requirement for notice because she called P&V to address her concerns about the concrete portion of the Project. However, not only does a phone call not comply with the statutory requirement for written notice, a conversation about concrete is irrelevant to P&V's noncompliance with HICA. Tennant also fails to show any actual damage suffered from P&V's noncompliance. Simply put, Tennant did not comply with her own obligations under HICA to receive damages. We find no error with the trial court's resolution of this issue.

[25] P&V challenges the trial court's elimination of prejudgment interest from its total damages award. The trial court determined that although P&V is entitled to prejudgment interest of approximately $5,000 and interest costs of $10,777.92 for money it borrowed to cover its losses, awarding both amounts would constitute unfair double-dipping. The trial court concluded that P&V is entitled to the greater of the two; hence, it awarded P&V $10,777.92 for interest and denied it approximately $5,000 in prejudgment interest.

[26] Prejudgment interest is awarded to fully compensate an injured party for the lost use of money. *Song v. Iatarola*, 76 N.E.3d 926, 939 (Ind. Ct. App. 2017), *trans. denied*. In a breach of contract action, an award of prejudgment interest is warranted if the amount of the claim rests upon a simple calculation and the terms of the contract make such a claim ascertainable. *Kopka, Landau & Pinkus v. Hansen*, 874 N.E.2d 1065, 1074 (Ind. Ct. App. 2007). "Prejudgment interest is computed from the time the principal amount was demanded or due and is allowable at the permissible statutory rate when no contractual provision specifies the interest rate." *Fackler v. Powell*, 923 N.E.2d 973, 977 (Ind. Ct. App. 2010). An award of prejudgment interest is generally not considered a matter of

---

[10] Because Tennant's reply brief did not address any of P&V's claims raised on cross-appeal, we may reverse if P&V presents a prima facie case of error. *In re Riddle*, 946 N.E.2d 61, 70 (Ind. Ct. App. 2011). "Prima facie error is error at first sight, on first appearance, or on the face of it." *Sand Creek Country Club, Ltd. v. CSO Architects, Inc.*, 582 N.E.2d 872, 876 (Ind. Ct. App. 1991) (internal quotation marks and citation omitted).

discretion. *Town of New Ross v. Ferretti*, 815 N.E.2d 162, 170 (Ind. Ct. App. 2004).

[27] The amount of P&V's breach of contract damages is the amount of money that P&V spent on labor and materials as well as its consequential damages (including the interest it paid on the loan it obtained to mitigate its financial losses). The monetary value of P&V's labor, materials, and consequential damages depends on a simple calculation and is ascertainable. Thus, P&V is entitled to prejudgment interest on its award. The fact that P&V's total damages award includes interest it paid on a loan does not affect its entitlement to prejudgment interest and does not constitute double-dipping.

[28] Because the damages resulting from the breach of contract were calculable and ascertainable at the time of trial, the trial court did not have the discretion to deny P&V prejudgment interest. Accordingly, we remand and order the trial court to calculate the amount of prejudgment interest to which P&V is entitled.

## IV. Attorney's Fees

[29] P&V argues that the trial court erred by not awarding it the full amount of attorney's fees it requested.[11] In an action to enforce a mechanic's lien, "a plaintiff or lienholder who recovers a judgment in any sum is entitled to recover

---

[11] Tennant argues that P&V is not entitled to attorney's fees, and states simply, without any discussion or authority, that this Court should order attorney's fees for her trial and appellate expenses. We decline to consider this argument.

reasonable attorney's fees. The court shall enter the attorney's fees as a part of the judgment." Ind. Code § 32-28-3-14(a). What constitutes a reasonable attorney's fee in an action to enforce a mechanic's lien is a question of fact, the computation of which may depend on a variety of factors, including the time and effort required; the value of the interest involved; the experience, reputation, and ability of the attorneys performing the services; and the results secured at trial. *Ponziano Constr. Servs. Inc. v. Quadri Enters., LLC*, 980 N.E.2d 867, 876 (Ind. Ct. App. 2012). The trial court has discretion in determining what constitutes a reasonable attorney's fee, and we will reverse only if the trial court's decision is clearly against the logic and effect of the facts and circumstances before the court. *Id.* The trial court may look at the responsibility of the parties in incurring the attorney's fees, and the trial judge possesses personal expertise he or she may use when determining reasonable attorney's fees. *Id.* at 876-77.

[30] This Court has further explained that

> The award of attorney's fees in an action to foreclose on a mechanic's lien is not an attempt to compensate the attorney for all the legal services performed in connection with the lien; rather, the amount of the award is intended to reflect the amount the lienholder reasonably had to expend to foreclose on the lien. Such awards should be made with caution so that excessive awards of attorney's fees do not discourage property owners from challenging defective workmanship on the part of lien holders. The amount awarded as attorney's fees therefore should be reasonable in relation to the amount of the judgment secured.

*Id.* at 877.

[31] Here, P&V's counsel submitted an affidavit and itemized billing records to the trial court after the trial regarding P&V's attorney's fees and expenses, which totaled $82,326.86. P&V is entitled only to the attorney's fees resulting from its action to foreclose on its mechanic's lien. Although the mechanic's lien was initially the primary issue between the parties, ultimately it was but one of multiple issues that arose in this case. Further, the attorney's fee must be reasonable in relation to the amount of the lien secured. The judgment for P&V was $34,006.21; excluding the damages for interest on its loan means P&V recovered $23,228.29 on its mechanic's lien. After the motion to correct error, the trial court ordered Tennant to pay $49,342.11 toward P&V's attorney's fees.

[32] We find that the trial court's award of attorney's fees was not against the logic and effect of the facts and circumstances before it. Initially, we note that it is challenging to determine which charges relate specifically to the mechanic's lien. Second, the trial court was in accord with caselaw when it sought to avoid an award amount that would discourage property owners from challenging defective workmanship on the part of the lien holders. And finally, the award was more than reasonable in relation to the amount of the lien secured—indeed, the attorney's fee was approximately $26,000 greater than the value of the mechanic's lien. *See Ponziano Constr. Servs. Inc.*, 980 N.E.2d at 877 (finding an attorney's fee award of $8,000 "not inadequate" for recovery of a mechanic's lien worth approximately $45,500). We affirm the trial court's decision to award P&V $49,342.11 in attorney's fees.

[33]     The judgment of the trial court affirmed in part, reversed in part, and remanded for calculation and award of prejudgment interest.

Vaidik, C.J., and Barnes, S.J., concur.